UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GABRIEL CHAVEZ, et al.,

    Plaintiffs,

    v.

SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT,

    Defendant.

No. C 22-06119 WHA

**ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## INTRODUCTION

In this putative class action alleging a failure to accommodate religious beliefs by defendant employer, plaintiffs seek to certify a class of current and former employees of defendant, appoint a class representative, and appoint class counsel. Certification is **DENIED**.

## STATEMENT

During the pandemic, the BART Board of Directors approved a policy mandating the COVID-19 vaccination of employees and board members by December 13, 2021. The mandate created exceptions for those who qualified for either medical or religious accommodations. BART received 188 requests for religious exemption and accommodation. Of those, 40 chose not to complete the application process, and were either vaccinated or terminated.

For those who did complete their application, the process proceeded as follows. *First*, requesters completed and submitted the *Employee Request for Religious Exemption (COVID-19 Vaccination)* form to BART's Leave Management Department. That form asked five questions:

1. My religion or belief system is (enter description):

2. I have held this belief(s) system, or practiced and observed this religion since (enter date or year):

3. My religion, belief system, or practice requires me to abstain from the COVID-19 vaccination because (describe the specific tenet, practice, or observation that conflicts with the COVID-19 vaccination requirement and/or explain how you follow it):

4. If your religion, belief system, or practice requires you to abstain from the COVID-19 vaccination, but not other types of vaccinations, please describe the specific tenet, practice, or observation that expressly conflicts with tho COVID-19 vaccination (attach a separate sheet if needed):

5. If requested, I can provide a written statement . . . from a religious leader, or other person describing my beliefs and practices, including information regarding when I embraced the belief or practice, as well as when, where, and how I have adhered to the belief, practice, observance: [ ] YES  [ ] NO.

(Dkt. No. 1-1 Exh. 1).

As plaintiffs, the amended complaint names 17 former employees working 13 different jobs, representing various unions and non-union positions.[*] Belief systems are equally varied. "Christianity," "the teachings of the Bible," "Catholic," "Islamism," "non-denominational Christianity," and "Born again Christian" are just a few of the faiths cited. Specific reasons for abstention were even more varied. Those who professed some form of Christian belief cited the injection of "foreign biological substances" into their bodies, the R&D process of the vaccine, and the alteration of a divinely-created immune system as objectionable. Yet another noted that they are "*not* anti-vax," but "anti tyranny [*sic*]" (Amd. Compl. Exh. 1). Some professed life-long adherence, others new-found faith. Letters from

---

[*] Another seventeen employees have filed suit in a second case. *See Cooper et al v. San Francisco Bay Area Rapid Transit District et al* (3:22-cv-09193-WHA). The papers in *Cooper* further illustrate the breadth of individual faiths, grounds for objection, and vocations captured here.

various pastors, churches, and the catholic archbishop of San Francisco, certificates of baptism, the United Nations Declaration on the Rights of Indigenous Peoples, and California Assembly Bill 685 were among the array of supporting documents attached to the requests.

Some applicants appended extensive personal statements to their submissions. Several recounted devout upbringings, another provided a list of domestic and international treaties and laws, yet another recounted occasions on which the applicant healed the sick via prayer, thus alleviating the need for surgeries and other conventional medicine. Others still expressed concerns about the medical consequences of vaccination and cited to the CDC's Vaccine Adverse Event Reporting System as evidence of "serious and fatal injuries" caused by vaccination (*ibid.*).

BART requested further information from many of the initial respondents through a supplemental documentation form. That form asked respondents to (1) "indicate what you would request as a reasonable accommodation that would enable you to perform the essential functions of your job without posing a direct threat to the health . . . of others," and (2) to "provide a written statement from a religious leader, or other person describing [your] beliefs and practices" (*ibid*.).

Next, a panel of three BART employees reviewed each application individually. If the panel determined that more information was required, an individual interview was conducted. That interview was guided by the *Religious Exemption Request Review Form* and the *Religious Exemption Interviews* documents, which were filled out by evaluators at the time of the interview.

Of the 148 completed applications, 70 were granted religious exemptions, 78 were denied. Those denied received a letter that noted that "after careful review and consideration of the information provided, your request is denied" (Amd. Compl. Exh. 2). They were given four options: (1) comply with the mandate, (2) retire, (3) voluntarily resign, or (4) do nothing and be terminated. Of those denied, 45 chose to receive the vaccine and continue their employment with BART; 36 retired, resigned, or were terminated.

3

1    Those 70 applicants who received exemptions were then considered for
2    accommodations. BART ultimately did not grant any applicant an accommodation. Each
3    applicant was sent a letter informing them that BART was "unable to identify a reasonable
4    accommodation for your request that would enable you to continue to meet job performance
5    and safety requirements and not place an undue hardship on the District" (Amd. Compl. Exh.
6    2). That letter notified applicants that BART would consider any additional accommodation
7    options submitted by the applicant. Upon consideration of additional accommodations, if any,
8    each applicant was issued a final denial letter and the same four options above (*ibid.*). Of the
9    70 applicants denied accommodation, 33 chose to be vaccinated while 37 resigned, retired, or
10   were terminated. In total, 73 employees lost their jobs as a result of being denied a religious
11   exemption or accommodation.

12   Finally, 25 requests for medical exemptions and accommodations were made. Some
13   submitted both a religious and medical exemption request. Eight medical exemptions were
14   granted. These employees were placed on unpaid leave for the period during which a medical
15   issue prevented vaccination. That leave ended only upon vaccination. No BART employee
16   was permitted to work while unvaccinated.

17   Plaintiffs seek to certify a Rule 23(b)(3) class composed of "all employees employed by
18   BART who (1) have been ordered to submit to a COVID-19 vaccination, (2) have sincerely
19   held religious beliefs which prevent them from taking the vaccine, (3) have submitted a request
20   for a religious exemption, and (4) were denied a religious accommodation" (Br. 6). In the
21   alternative, plaintiffs propose a class of all employees employed by PART who "(1) have been
22   ordered to submit to a COVID-19 vaccination, (2) have sincerely held religious beliefs which
23   prevent them from taking the vaccine, (3) have submitted a request for religious exemption and
24   religious accommodation, and (4) whose request for a religious exemption were denied"
25   (*ibid.*).

26   Plaintiffs advance three claims: a Title VII claim, a First Amendment free exercise of
27   religion claim under Section 1983, and a California Fair Employment and Housing Act
28   claim. Each claim is grounded in BART's alleged failure to adequately accommodate putative

4

class members' requests for religious exemptions and accommodations to the COVID-19 vaccine mandate.

## ANALYSIS

Class certification is a two-step process. Plaintiffs must first show that the four prerequisites of Rule 23(a) are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Because plaintiffs seek a damages class under Rule 23(b)(3), they must also establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." A plaintiff bears the burden of demonstrating that these requirements are met. *See Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956 (9th Cir. 2013). "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 465-66 (2013).

This order cuts directly to the heart of the parties' dispute: Rule 23(b)(3)'s predominance and superiority requirements. Plaintiffs' proposed class (and proposed alternative) fail on both counts. Either failure alone precludes class certification and eliminates the need for this order to reach Rule 23(a)'s requirements. Plaintiffs' motion is accordingly **DENIED**.

1. **COMMON ISSUES DO NOT PREDOMINATE.**

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "While the predominance requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is much higher at this stage of the analysis." *Aldapa v. Fowler Packing Co., Inc.*, 323 F.R.D. 316, 328 (E.D. Cal. 2018) (Judge Dale Drozd).

5

1    An "assessment of predominance begins, of course, with the elements of the underlying
2    cause of action." *Walker v. Life Ins. Co. of the Southwest*, 953 F.3d 624, 630 (9th Cir. 2020)
3    (internal quotations omitted). "To determine whether a class satisfies the requirement, a court
4    pragmatically compares the quality and import of common questions to that of individual
5    questions." *Jabbari v. Farmer*, 965 F.3d 1001, 1005 (9th Cir. 2020). The Supreme Court had
6    laid out the analysis:

> This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof. The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotations, modifications, citations omitted). Each claim is evaluated below.

### A.    PLAINTIFFS' TITLE VII AND FEHA CLAIMS FAIL PREDOMINANCE.

As to plaintiffs' Title VII and FEHA claims, the disparate factual predicates of each applicant's exemption and accommodation request defeat predominance. Common questions do not predominate if, as a practical matter, "the resolution of … an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Kang v. Credit Bureau Connection, Inc.*, No. 118CV01359AWISKO, 2022 WL 658105, at *6 (E.D. Cal. Mar. 4, 2022) (internal quotation omitted).

To make out a Title VII failure-to-accommodate claim, a plaintiff must first show that "(1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). If plaintiffs make that *prima facie* case, "the burden then shifts to [defendant] to show that it initiated good faith efforts to accommodate reasonably the employee's religious

practices or that it could not reasonably accommodate the employee without undue hardship." *Ibid.* (internal quotation and citation removed).

Plaintiffs' FEHA claims require a similar analysis. Here, too, it is unlawful "[f]or an employer . . . to discharge a person from employment . . . because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer or other entity covered by this part demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance . . . but is unable to reasonably accommodate the religious belief or observance without undue hardship." Cal Gov't Code § 12940(l)(1).

Plaintiffs' bona fide religious belief and defendant's undue hardship are the only real points of contention between the parties, and both turn on individualized proof.

### *(i)   Bona fide religious belief.*

While "the burden to allege a conflict with religious beliefs is fairly minimal," this "does not mean that courts must take plaintiffs' conclusory assertions of violations of their religious beliefs at face value." *Bolden-Hardge v. Off. of California State Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023). A plaintiff must show that their request articulated a religious belief, rather than a political objection or other personal non-religious belief. *UnifySCC v. Cody*, No. 22-CV-01019-BLF, 2022 WL 2357068, at *2 (N.D. Cal. June 30, 2022); U.S. Equal Emp. Opportunity Comm'n, "What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws," § L at L.2 ("Title VII does not protect social, political, or economic views or personal preferences.").

Plaintiffs submitted nearly as many systems of belief and grounds for objection as they did applications. Whether or not any one request rests on a bona fide religious belief presents an individual inquiry that requires the consideration of evidence pertaining only to the response in question. It is doubtful that the various written and interview responses of plaintiff Chavez, for example, will have any evidentiary value as to the bona fide religious belief of the class as a whole, or that any one class member will be able to make the necessary showing via common

7

proof (i.e., without proffering individual responses, as done by all 35 named plaintiffs in all related actions before this Court).

### *(ii)* Undue Hardship.

BART's undue hardship showing—likely to be the dispositive issue in this action—also rests on individual factual issues. "Undue hardship is shown when a burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). "[C]ourts must apply the [undue hardship] test in a manner that takes into account all the relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Groff*, 600 U.S. at 470-71. The vocational diversity of plaintiffs' proposed class breaks common issues into a variety of individual factual inquiries, defeating predominance. *Kang*, 2022 WL 658105, at *6. A prima facie failure to accommodate claim under FEHA, meanwhile, requires a showing that the defendant failed to reasonably accommodate plaintiff. *Gardner v. Fed. Express Corp.*, 114 F. Supp. 3d 889, 901 (N.D. Cal. 2015).

*First*, the undue hardship inquiry requires consideration of "the particular accommodations at issue." *Bordeaux*, 2023 WL 8108655, at *2. Potential class members are drawn from a large diversity of jobs—the 17 potential class members named in plaintiffs' amended complaint hold over a dozen unique jobs. For example, accommodations reasonably considered in the context of a train conductor's request bear no relation to the job functions and reasonable accommodations BART must consider when evaluating the exemption request of a manager of technology programs, or a fire protection worker, or a police officer, or a senior operations supervisor liaison.

*Second*, an employer is not required to transgress upon the rights of other employees, such as those contained in a collective-bargaining agreement. *Groff*, 600 U.S. at 465 ("The *Hardison* Court was very clear that those rights were off-limits."); *Peterson*, 358 F.3d at 607 ("[A]n employer need not accommodate an employee's religious beliefs if doing so would result in discrimination against his co-workers or deprive them of contractual or other statutory rights."). For example, determining the universe of reasonable accommodations for a non-

8

union position such as manager of technology programs will not resolve the universe of accommodations available to a potential class member whose employment is governed by contracts negotiated by SEIU Local 1021, ATU 1555, AFSCME Local 3993, or the BPOA, to name a few. The significance of these contracted-for rights is two-fold. First, union contracts may create a bespoke universe of reasonable accommodations and attendant hardships because they define a potential class member's rights. Second, they may do the same because they grant impacted coworkers certain rights, such as seniority, that BART is not required to transgress upon. The number of distinct factual inquiries necessary, and the inevitable variety of answers they will generate, render the issue unmanageable as a class action.

*Finally*, the reasonable accommodations and undue hardship prong of plaintiffs' TITLE VII and FEHA claims do not even impact a significant portion of the proposed class. Of 148 completed applications, some 78 were denied religious exemptions outright. This means that they never moved to the accommodations stage of consideration. Evidence and argument aimed at resolving the accommodation issue will therefore not aid in resolving their claims. Plaintiffs propose an alternative class that captures just those 78 employees denied a religious exemption outright. This pares down the contested issues to just one: bona fide religious belief. As noted above, that issue, too, is one that will necessitate individualized inquiry.

Some aspects of the hardship considerations are more amenable to common proof. First, hardships are considered "in the overall context of an employer's business." *Groff*, 600 U.S. at 468. Some of that context – such as BART's size and operating costs – is subject to common proof. Of course, the specific accommodations and associated hardships being weighed against that context will stem from close examination of individualized facts, as discussed above. Second, the health and safety argument advanced by defendant is, to an extent, susceptible to common proof. *See Kushner v. N.Y.C. Dep't of Educ*., No. 22-cv-5265-DLI-VMS, 2023 WL 6214236, *5 (E.D.N.Y. Sept. 25, 2023) ("[C]reating a health and safety risk that would have prevented the DOE from fostering a safe educational and work environment . . . alone would have established an undue hardship."). The *Bordeaux* court's analysis of a similar argument turned on national daily mortality data. *Bordeaux*, 2023 WL 8108655, at

\*13. However, *Bordeaux* also relied on the fact that plaintiff's job required her to be on camera, in close proximity to others. *Ibid*. Here, the purported class's job diversity again means that the degree of hardship cannot be understood without an interrogation of individual employees' job duties. BART may show that no reasonable accommodation could have allowed a police officer to fulfill their job functions without presenting an undue health risk to others, but fail to make the same showing for a computer-bound administrator amenable to working from home.

Finally, plaintiffs advance a common proof they believe may be dispositive of the entire action: eight of twenty-five requests for medical exemption were granted, while no religious accommodations were granted. It is true that statistical evidence of disparate outcomes can be a powerful form of common proof, but the probative value of such proof is diminished by limited sample sizes. *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 522-523 (N.D. Cal. 2012). Moreover, our Court of Appeals has already rejected a similar argument: the fact that "an employer's internal exemption policies are applied uniformly to the employees" does not create predominance where "serious issues regarding individual variations" defy common proof. *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009). BART considered only 70 religiously exempt employees for accommodation (Amd. Compl. 23). Considering the small number of requests, the fact that BART did not grant any accommodations does not prove that BART "did not undergo" individualized accommodation analyses (Br. 8; Nuetzel; Decl. Exh. D 44:12-20).

Nevertheless, the existence of *any* non-religious exemption may be relevant to defendant's safety-based hardship argument. As the Fifth Circuit noted, if an employer has granted several non-religious exemptions, it would be "illogical" to suggest that the presence of a religious unvaccinated employee poses some special danger or burden. *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 349 (5th Cir. 2022). However, "[o]nly *permanent* medical exemptions are analogous to religious exemptions, because a religious belief is not likely to be temporary, and a temporary accommodation is much different—and likely much easier to accommodate—than a permanent one." *Short v. Berger*, 593 F. Supp. 3d 944, 951 (C.D. Cal.

10

2022), appeal dismissed, No. 22-55339, 2022 WL 2421096 (9th Cir. May 17, 2022). BART asserts it did not grant *any* permanent accommodations (Maplestone Decl. 2). Moreover, those granted medical exemptions were placed on unpaid leave and not allowed to work until vaccinated (*ibid*). The existence of eight temporary medical exemptions is therefore given little weight in this analysis.

Considering the above, it cannot be said that common issues predominate. Plaintiffs' putative class fails because its members have little in common beyond their request for religious accommodation. They do not share a common religious objection. They do not share a vocation or a set of contractual rights. They do not present a similar set of potential accommodations and associated burdens. They do not present similar health and exposure concerns. Potential accommodations do not impact the same pool of co-workers. Those coworkers do not have the same bargained-for rights. Each difference is material to the claims at hand and requires the fact finder to delve into the details of individual plaintiffs' requests. *In re Wells Fargo*, 571 F.3d at 959 (exemptions that "require[] a fact-intensive inquiry into each potential plaintiff's employment situation" militate against certification).

### B. PLAINTIFFS' FREE EXERCISE OF RELIGION CLAIM FAILS PREDOMINANCE.

Resolution of plaintiffs' free exercise of religion claim likewise turns on individual issues. Plaintiffs' claim requires the following inquiry:

> To merit protection under the free exercise clause of the First Amendment, a religious claim must satisfy two criteria. First, the claimant's proffered belief must be sincerely held; the First Amendment does not extend to so-called religions which are obviously shams and absurdities and whose members are patently devoid of religious sincerity. Second, the claim must be rooted in religious belief, not in 'purely secular' philosophical concerns. Determining whether a claim is "rooted in religious belief" requires analyzing whether the plaintiff's claim is related to his sincerely held religious belief.

*Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994), supplemented, 65 F.3d 148 (9th Cir. 1995). The analysis then turns to the government policy in question and asks whether it is a neutral law of general applicability. *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872,

11

1   879 (1990). If so, the policy's incidental burden on any one religious belief does not give rise

2   to a claim. *Ibid.*; *Minersville School Dist. Bd. of Ed. v. Gobitis*, 310 U.S. 586, 594–595 (1940):

3   "Conscientious scruples have not, in the course of the long struggle for religious toleration,

4   relieved the individual from obedience to a general law not aimed at the promotion or

5   restriction of religious beliefs."). However, if the policy fails the neutrality or general

6   applicability standards, it is then subjected to strict scrutiny. *Fulton v. City of Philadelphia,*

7   *Pennsylvania*, 141 S. Ct. 1868, 1876 (2021).

The sincerity and religious nature of plaintiffs' belief is, as noted above, an individualized issue. Plaintiffs cite myriad scripture and personal experiences, CDC VARS data and concerns regarding health consequences, the Organization of American States Declarations of Rights of Indigenous Peoples, Senate Bill 1383 and Senate Bill 1159, among others, as grounds for objection. Many identify non-vaccination as a core religious tenant, some characterize their decision as a "personal choice," a number discuss medical concerns, while another appears to assert a Fourth Amendment right. As before, the need to determine whether plaintiffs have met the bona fide religious belief threshold generates "an unmanageable variety of individual . . . factual issues," and forecloses on class certification. *Kang*, 2022 WL 658105, at *6.

### C.    SUPERIORITY

While failure on predominance alone bars certification of plaintiffs' proposed class, plaintiffs' proposed class likewise fails to meet Rule 23(b)(3)'s superiority requirement. "In determining superiority, courts must consider the four factors of Rule 23(b)(3)." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir.), opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001).

The first factor considers "the class members' interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). "This factor weighs against class certification where each class member has suffered sizeable damages or has an emotional stake in the litigation." *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 444 (E.D. Cal. 2013); *Amchem* 521 U.S. at 617 ("The policy at the very core of the class

12

action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."). The second factor often merges with the first and asks the Court to consider "the extent and nature of any litigation concerning the controversy already begun by or against class members[.]" FRCP. 23(b)(3)(B). "While any class member who wishes to control his or her own case may opt out of the class, other pending litigation is evidence that individuals have an interest in controlling their own litigation." *Gonzalez-Tzita v. City of Los Angeles*, No. CV 16-0194 FMO (EX), 2019 WL 7790440, at *8 (C.D. Cal. Dec. 9, 2019) (internal quotations and citation omitted).

Both factors weigh against superiority. Class members have significant interests in the individual control of their claims. Plaintiffs' asserted damages include "base earnings, additional earnings, health benefits, money purchase plan benefits, and employer CalPERS Contributions" (Dkt. No. 41-2). Further, plaintiffs cast the issue as one of extreme emotional and personal stakes: a "key decision[] in life," a "serious matter," and "anguish of the soul." These financial and emotional stakes are further evidenced by purported class members' pending litigations. Two potential class members have brought individual actions against BART, one in state court, and the other in federal. Seventeen employees have filed suit in a third litigation. *Cooper et al v. San Francisco Bay Area Rapid Transit District et al* (3:22-cv-09193-WHA). Another seventeen have brought this action. All told, 36 of the 73 employees who lost their jobs due to the rejection of a religious exemption or accommodation have already made their way to court. Putative class members' demonstrated interest in bringing and controlling these various litigations further reflects the significant monetary and emotional stakes at issue, and counsels against class certification.

Finally, there are "likely difficulties in managing [the] class action." FRCP 23(b)(3)(D). These difficulties are rooted in the wide range of individual issues and proofs laid out in this order's predominance analysis. A class action is not superior to other available methods of adjudication available to proposed class members.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion to certify a class is **DENIED.**

**IT IS SO ORDERED.**

Dated: January 28, 2024

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

14