UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GABRIEL CHAVEZ, et al.,

      Plaintiffs,

    v.

SAN FRANCISCO BAY AREA RAPID
TRANSIT DISTRICT,

      Defendant.

No. C 22-06119 WHA

**ORDER RE CROSS MOTIONS FOR
SUMMARY JUDGMENT**

**INTRODUCTION**

Employees of defendant transit district lost their jobs due to their refusal to comply with defendant's COVID-19 vaccine mandate. They then brought this action alleging violations of the Free Exercise Clause, Title VII, and FEHA. Plaintiffs now move for summary judgment of all claims. Defendant has separately moved for summary judgment against plaintiffs' Free Exercise claim. For the reasons stated below, plaintiffs' motion for summary judgment is **DENIED**. Defendant's motion for summary judgment as to plaintiffs' Free Exercise claim is **GRANTED**.

**STATEMENT**

BART is a heavy-rail public transit system that operates 50 stations in five Bay Area counties and employs some 3,900 people. During the pandemic, BART's employees (and state and federal mass transit workers generally) were deemed essential workers. In October 2021,

the BART Board of Directors approved a policy mandating the vaccination of employees and board members by December.  The mandate expressed BART's concern regarding its continued operation amid widespread employee unavailability due to infection:

> "Since the national emergency shutdown in March 2020, when ridership dropped below 5%, BART has lost over 20,960 days of productivity and had 2,377 employees use pandemic related leave demonstrating the breathtaking toll the pandemic has had on our staff and service . . . . Whereas in winter 2020 BART saw between a three- and nine-fold increase in cases, and the current prevalence of the Delta variant [is] causing positive cases at a 54% higher rate for unvaccinated employees, BART must take responsible action to protect our ability to function."

(Dkt. No. 51-1 at 7).  The mandate was applicable to "all BART employees and Board members" (*ibid.*).  Failure to provide proof of vaccination by December 13 resulted in "termination for failure to meet a condition of employment" (*id.* at 10).  Exceptions were made "only for those who qualify for a Reasonable Accommodation based on a medical condition or sincerely held religious belief" (*id.* at 12).

BART received a total of 205 exemption requests:  17 sought medical exemptions, the remainder religious.  Ten medical applicants completed the process, and eight were granted an accommodation, which invariably consisted of unpaid leave pending vaccination.  No one was granted an accommodation permitting a return to work absent vaccination.

Of the religious objectors, 40 abandoned their requests prior to disposition.  Each of the remaining requests for religious exemption and accommodation were subjected to a uniform system of review documented in an October 15 standard operating procedure.  *First*, religious objectors completed and submitted a standardized questionnaire (the *Employee Request for Religious Exemption (COVID-19 Vaccination)*) to BART's leave management team.  The form asked applicants to identify (1) their religion or belief system; (2) length of belief; (3) tenets of the belief which require abstention; (4) the belief system's views regarding other vaccines; (5) reasonable accommodations the applicant would request if granted an exemption; and (6) a written statement or other document from a religious leader or other person describing the belief system and the applicant's adherence to it.  *Second*, Leave Management reviewed each

request for completeness and asked applicants for additions or clarifications as needed.  Where necessary, BART's reviewers interviewed the objector.  The interviewers were guided by a standardized questionnaire, and examiners recorded answers from the objector in a second standardized form.  *Finally*, a three-person panel reviewed each application and rendered an exemption decision.  BART granted 70 requests for religious exemption.  Of those denied exemptions, 45 chose to be vaccinated and remain employed with BART; the remainder resigned, retired, or were terminated.

Those granted a religious exemption were then considered for accommodation.  BART's Manager of Leave Programs Rodney Maplestone and HR Manager Gizelle Huynh administered the accommodations process and rendered final decisions.  BART allowed objectors to propose their own set of possible accommodations and addressed the reasonableness of each such request in letter responses.  BART failed to identify a reasonable accommodation for any of the 70 exempted employees and sent each a denial letter stating that they must (1) comply with the mandate, (2) retire, (3) resign voluntarily, or (4) do nothing and be terminated.  Of the 70, 33 chose to be vaccinated while 37 resigned, retired, or were terminated.

In sum, 73 employees who requested a religious exemption and accommodation lost their jobs.

Plaintiffs, 17 of those 73 former employees, now advance three claims:  a First Amendment Free Exercise of Religion claim under Section 1983, and failure to accommodate claims under both Title VII and the California Fair Employment and Housing Act.  Plaintiffs now move for summary judgment on all three claims, while defendant has filed a counter-motion for summary judgment of the Free Exercise claim.

This order follows full briefing and oral argument.

The essence of this long order is that plaintiffs' Free Exercise claim does not warrant further litigation, while their Title VII and FEHA claims are rife with individualized fact disputes that require it.

Plaintiffs' Free Exercise claim fails on summary judgment because BART's mandate and exemption process constitute a neutral law of general applicability that readily clears rational basis review. BART's vaccine process was neutral and generally applicable because it was not intolerant of religious beliefs, did not contain a system of discretionary decision making that enabled BART to extend benefits for secular reasons while declining to do so in cases of religious hardship, and did not treat similarly situated secular conduct differently. BART's mandate, like the many neutral and generally applicable COVID-19 vaccine mandates challenged before it, easily satisfies rational basis review. BART's motion for summary judgment of plaintiffs' Free Exercise claim must therefore be granted.

This order denies summary judgment of plaintiffs' Title VII and FEHA claims because these claims present highly individualized, fact-intensive inquiries concerning both the range of accommodations available, if any, and the health and safety burdens imposed on BART by such accommodations. The record, as it stands, does not allow for that fact-intensive inquiry to take place. Plaintiffs' attempt to side-step the shortcomings of the record by way of group-wise argument fails because it asks this order to resolve context-dependent fact issues by way of circumstantial evidence drawn from non-parties.

### 1. PLAINTIFFS' FREE EXERCISE CLAIM.

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." However, the right to exercise one's religion freely "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990) (internal quotation marks, citations omitted). Free Exercise claims are subject to a two-step analysis. A court must first determine whether a law or policy is "a valid and neutral law

4

of general applicability." *Ibid*.  If so, it must then review that law under the rational basis standard, which requires that government action be "rationally related to a legitimate governmental purpose." *Stormans, Inc. v. Wiseman*, 794 F.3d 1064, 1084 (9th Cir. 2015).  If a law fails either neutrality or general applicability, it is instead subject to judicial review under the strict scrutiny standard, which requires that government action be "justified by a compelling governmental interest and [ ] be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 531-532 (1993).  This order addresses each step in turn.

### A. STEP ONE: BART'S MANDATE AND EXEMPTION AND ACCOMMODATION PROCEDURE CONSTITUTE A NEUTRAL LAW OF GENERAL APPLICABILITY.

With regards to step one, because plaintiffs do not contest the neutrality of BART's mandate and exemption and accommodation procedure, this order moves directly to general applicability (Reply 4, n. 1).

A law may fail general applicability in two distinct ways.  *First*, "a law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1877 (2021) (internal quotations and modifications omitted).  *Second*, a law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Ibid*.  Each is addressed in turn.

### B. INDIVIDUALIZED EXEMPTIONS.

The BART mandate's exemption procedure does not undermine general applicability.  "The mere existence of an exemption that affords some minimal governmental discretion does not destroy a law's general applicability." *Stormans*, 794 F.3d at 1082.  "What makes a system of individualized exemptions suspicious is the possibility that certain violations may be condoned when they occur for secular reasons but not when they occur for religious reasons." *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d Cir. 2007);  *Kane v. De Blasio*, 19 F.4th 152, 165 (2d Cir. 2021) ("[T]here must

be some showing that the exemption procedures allow secularly motivated conduct to be favored over religiously motivated conduct.").

In *Sherbert v. Verner*, a Seventh Day Adventist lost her job because she refused to work on her sabbath. 374 U.S. 398, 401 (1963). Unable to find a job that allowed her to maintain that day of rest, she applied for unemployment benefits. She was denied under a provision of the South Carolina Unemployment Compensation Act that rendered a claimant ineligible for benefits "[i]f . . . he has failed, without good cause . . . to accept available suitable work when offered." *Id*. at 400. The Employment Security Commissioner deemed the plaintiff's keeping of her sabbath not to be good cause. *Id*. at 401. Per *Smith*, the "good cause" standard was not generally applicable because it created a system of discretionary decision making that enabled the state to extend benefits for secular reasons, while declining to do so in cases of religious hardship. *Smith*, 494 U.S. at 884 ("[O]ur decisions in the unemployment cases stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason.") (internal quotation omitted). In *Fulton*, meanwhile, the City of Philadelphia's standard foster care contract required that "[foster placement] Provider[s] shall not reject a child or family including, but not limited to, … prospective foster or adoptive parents, for Services based upon … their … sexual orientation … unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion." Like the good cause exception in *Sherbert*, the contract in *Fulton* incorporated an "entirely discretionary exception[]" that "invite[d] the government to decide which reasons for not complying with the policy are worthy of solicitude" at the Commissioner's "sole discretion." 141 S. Ct. at 1878-79.

BART's review process does not undermine general applicability because it bears no resemblance to the "regime[s] of unfettered discretion [permitting] discretionary treatment of religion" discussed in *Fulton*, *Sherbert*, and *Smith*. *Stormans*, 794 F.3d at 1082. BART's review process served a clearly defined objective:

> The interview questions were developed by me and my staff based on EEOC guidance. The questions were not designed to question the sincerity of the individual's religious beliefs, which we

> assumed were sincere. The questions were designed to evaluate whether the objection to the COVID-19 vaccination was related to those beliefs and whether the belief that prevented an employee from being vaccinated was religious, rather than secular . . . The decision whether to grant a religious exemption was based on the EEOC guidelines and a determination of whether the objection to vaccinations was related to the employee's religious beliefs or was based on secular beliefs."

(Dkt. No. 52-2 at 3).  That limited inquiry is an appropriate one.  BART considered (1) whether the applicant's reason for objection was based on a religious, rather than secular belief, and (2) determined the availability of reasonable accommodation.  BART did not do so via vague grants of unfettered discretion.  It hewed to statutorily imposed accommodation obligations under FEHA and Title VII (Dkt. No. 52-2 at 2-4).  The inevitable exercise of some discretion in executing those statutory obligations does not undermine general applicability.  *UnifySCC v. Cody*, No. 22-CV-01019-BLF, 2022 WL 2357068, at *8 (N.D. Cal. June 30, 2022) (Judge Beth Freeman) ("Unlike in . . . *Fulton*, the County does not exercise any discretion in granting a religious exemption once it determines that the exemption is sought for a religious (rather than a non-religious) reason."); *Ferrelli v. Unified Ct. Sys.*, No. 122CV0068LEKCFH, 2022 WL 673863, at *7, n. 8 (N.D.N.Y. Mar. 7, 2022) (Judge Lawrence Kahn) (holding that an exemption with a "clearly defined" justification for an accommodation "did not 'invite the government to decide which reasons for not complying with the policy are worthy of solicitude.'") (quoting *Fulton*, 141 S. Ct. at 1879).  Moreover, the process employed standardized procedures and criteria modeled on then-current EEOC guidance (Dkt. 52-1 at 30-31).  While it takes some degree of individualized inquiry and discretion to determine whether any one objector is eligible for even the most strictly defined exemption, that kind of limited inquiry is qualitatively different from the unfettered discretion addressed by *Fulton* and *Sherbert*.  *See Pilz v. Inslee*, No. 3:21-CV-05735-BJR, 2022 WL 1719172 (W.D. Wash. May 27, 2022) ("*Fulton* did not hold that any law containing exemptions is per se not generally applicable.") (citations omitted).

Plaintiffs' contrary argument asserts, in reliance on *Fulton*, *Sherbert*, and *Smith*,  that "[w]hen the government puts in place a regulatory process which includes a mechanism for

individualized assessments, the process is not generally applicable," and that "[t]he process used by BART's Leave Management comes under strict scrutiny review in that it set up a mechanism for individual review of each request for a religious exemption and accommodation" (Br. 9). However, *Fulton, Smith* and *Sherbert*, when viewed in context (provided above), each referred to exemptions that afforded the state discretion to favor secular conduct over religious conduct. *See Fulton*, 141 S. Ct. at 1877; *Lighthouse*, 510 F.3d at 276; *Kane*, 19 F.4th at 165.

The BART mandate's exemption procedure did not allow secularly motivated conduct to be favored over religiously motivated conduct. The religious exemption at issue did just the opposite: it extended a benefit to religiously motivated conduct that was denied to similar secularly motivated conduct. Plaintiffs' argument – that *any* individualized inquiry triggers strict scrutiny – leads to a topsy-turvy outcome: while a vaccine mandate making *no* religious exemption would be subject to rational basis review, a mandate that seeks to reduce intrusion upon religion by way of a religious exemption would *by virtue of that exemption* be made subject to strict scrutiny. This argument has been rejected before; it is rejected again here. *UnifySCC*, 2022 WL 2357068, at *7; *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015); *Ferrelli*, 2022 WL 673863, at *6. Moreover, "such an interpretation would create a perverse incentive for government entities to provide no religious exemption process in order to avoid strict scrutiny." *Ferrelli*, 2022 WL 673863, at *7; *UnifySCC*, 2022 WL 2357068, at *7.

Nor does the medical exemption undermine general applicability. Courts confronted with well-defined medical exemptions to COVID-19 mandates have held that the existence of such an exemption does not trigger strict scrutiny. *Does 1-6 v. Mills*, 16 F.4th 20, 30-31 (1st Cir. 2021); *UnifySCC,* 2022 WL 2357068, at *7; *Pilz*, 2022 WL 1719172, at *4. Indeed, *We The Patriots USA, Inc. v. Hochul* found that the plaintiffs failed to carry their burden of showing that a COVID-19 vaccine mandate was not generally applicable where that mandate had a medical exemption but not a religious one. 17 F.4th 266, 284-88 (2nd Cir. 2021).

Plaintiffs' overbroad reading of *Fulton* and *Smith* would lead to a radical expansion of strict scrutiny. The BART exemption and accommodation process was mandated by Title VII and FEHA. In order to fulfill those statutory obligations, employers like BART must undertake some degree of individualized review. As plaintiffs state it, under Title VII, "at a minimum, the employer is required to negotiate with the employee in an effort reasonably to accommodate the employee's religious beliefs" (Reply 12). To hold that fulfillment of that statutory obligation, standing alone, triggers strict scrutiny will only ensure that every Title VII compliant policy is so scrutinized. That result runs headlong into *Smith's* warning against the indiscriminate imposition of strict scrutiny in the Free Exercise context:

> The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development. To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is compelling – permitting him, by virtue of his beliefs, to become a law unto himself – contradicts both constitutional tradition and common sense.

*Smith*, 494 U.S. at 885 (internal quotation marks and citations omitted). Plaintiffs' response to this concern merely implies (but does not state) that a Title VII evaluation can be conducted in a manner that does not trigger strict scrutiny (Reply 6, "[t]he Plaintiffs' position is that a Title VII evaluation can be conducted in a manner that constitutes an individualized exemption"). Nevertheless, plaintiffs' desired rule demands strict scrutiny upon "individual review of each request for a religious exemption and accommodation," without more (Br. 9). Indeed, in their opposition to defendant's cross-motion for summary judgment, plaintiffs concede that BART pursued a "uniform mechanism for review," but point to the fact that "the reviewer had the discretion on a case-by-case basis to determine whether to grant a religious exemption for a given employee" as sufficient grounds for the application of strict scrutiny (Dkt. No. 54 at 14). It is therefore unclear how *any* Title VII exemption process – short of absolute passivity – could escape strict scrutiny. Such passivity would ultimately allow every person "to become a law unto [themselves] – contradict[ing] both constitutional tradition and common sense." *Smith*, 494 U.S. at 885.

This order does not hold that exemption and accommodation procedures required by, and complaint with, Title VII or FEHA are *per se* outside strict scrutiny. That is an individual inquiry. In the same vein, the presence of Title VII accommodation procedures, without more, does not *per se* trigger strict scrutiny, as plaintiffs' argument requires. Here, plaintiffs point to BART's ability to approve or deny a religious exemption request. That is not enough.

### C. COMPARABLE CONDUCT.

A law may likewise fail general applicability and thereby necessitate strict scrutiny review "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. The BART mandate and exemption procedure did not do so. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue. Comparability is concerned with the risks various activities pose, not the reasons why people gather." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (citations omitted). *Tandon* concerned California's restrictions on private gatherings during the pandemic. Those restrictions "treat[ed] some comparable secular activities more favorably than at-home religious exercise, permitting hair salons, retail stores, personal care services, movie theaters" and so on to bring together more than three households at a time, while restricting religious gatherings in private homes to just three households. *Id*. at 64. The Supreme Court held that the law was therefore not generally applicable.

Here, the October 2021 Statement of Policy clearly identifies the asserted government interest:

> Whereas in winter 2020 BART saw between a three- and nine-fold increase in cases, and the current prevalence of the Delta variant causing positive cases at a 54% higher rate for unvaccinated employees, BART must take responsible action to protect our ability to function. BART has a duty to provide a safe and healthy workplace, consistent with COVID-19 public health guidance and legal requirements, to protect its employees and the public as services reopen and more employees return to workplaces . . . . Unvaccinated employees are at greater risk of contracting and spreading COVID-19 within the workplace and BART facilities, as well as to the public that depends on our services. Therefore, all BART employees and Board members shall be fully vaccinated against COVID-19.

(Dkt. No. 51-1 at 7). The mandate applied to all employees, including part-time staff and "consultants and contractors who perform work on BART property" (Dkt. No. 51-1 at 7, 9).

Plaintiffs argue instead that BART's policy permitted similar secular conduct because BART "allowed passengers to ride trains and congregate at stations who were unvaccinated," but "would not allow unvaccinated employees to work at these same venues" (Br. 10). A similar argument was advanced in *Kane*, where plaintiff teachers challenged a vaccine mandate that required Department of Education employees and contractors to be vaccinated, but did not require proof of vaccination from campus visitors (such as emergency responders, delivery persons, repair persons, and certain temporary campus visitors). *Kane*, 19 F.4th at 166. *Kane* rejected the argument, holding that, "viewed through the lens of the City's asserted interest in stemming the spread of COVID-19, these groups are not comparable to the categories of people that the Mandate embraces. While the exempt groups do not come into prolonged daily contact with large groups of students (most of whom are unvaccinated), the covered groups (for example, teachers) inevitably do." *Ibid*. A similar distinction is at issue here.

In this connection, BART has provided evidence that employees and members of the public did not pose the same risk. Nancy M. McClellan, a certified industrial hygienist, opines that employees and passengers posed very different risks with regards to the spread of COVID-19 to BART personnel due to differences in their lengths of exposure to other BART employees (Dkt. No. 51-4 at 9-10). McClellan notes that disease spread is especially common in "higher risk settings, defined as those spaces that have occupants that are potentially infected with the COVID-19 virus, crowded, *occupied for longer durations of time*, and with uncontrolled or inadequate ventilation" (Dkt. No. 51-4 at 4, emphasis added). "The risk level is much lower for customers and former employees spending minutes in transit environment compared to current BART employees spending many working hours in the sometimes high-risk environment of the transit system due to the differing duration and resulting likelihood of exposure" (*ibid*).

In reply, plaintiffs appear to misunderstand the claims made by McClellan, characterizing her declaration as a "bald assertion by a non-percipient-hygienist declarant that the public takes

short train trips of a few minutes whereas BART employees ride for prolonged periods" (Reply 7). BART's summation reflects, in this order's view, the more accurate reading of McClellan's opinion: that sharing a working space (such as a station, office, maintenance facility, or other enclosed space) for the duration of a working day or week poses a quantitatively different risk of exposure and transmission than does an individual's relatively brief presence in a train car or other BART facility (Dkt. No. 56 at 12). Plaintiffs' briefing does not otherwise rebut the risk evaluations made by McClellan or her expertise on the matter.

This order pauses to address the issue of plaintiffs' rebuttal expert. The present action is related to two others. *See Mitchell v. San Francisco Bay Area Rapid Transit District et al* (3:22-cv-07720-WHA); *Cooper et al v. San Francisco Bay Area Rapid Transit District et al* (3:22-cv-09193-WHA. In all three, former BART employees, represented by the same counsel, advance substantially identical arguments against BART's vaccine mandate. In all three, plaintiffs have retained Dr. Harvey Risch to offer an expert opinion pertaining to the use and relative efficacy of the COVID-19 vaccine (Dkt. No. 58-1 at 217). Plaintiffs first disclosed Dr. Risch well after the relevant deadline in each action. However, the Court denied BART's motion to exclude and strike Dr. Risch and his rebuttal report as late disclosed, conditioned on plaintiffs' reimbursement of BART's resulting attorney's and expert's fees (Dkt. No. 65). Those conditions now having been met, plaintiffs' late disclosed rebuttal expert and his report will be available to plaintiffs at trial.

The actions' staggered summary judgment briefing schedules, coupled with plaintiffs' failure to timely retain an expert and disclose rebuttal reports, has created disparities between the three related actions' respective summary judgment records. In the present action, plaintiffs did not file any expert declaration in support of summary judgment. In *Mitchell*, plaintiffs filed a declaration from Dr. Risch in their February 28 summary judgment *reply* (3:22-cv-07720-WHA Dkt. No. 35). In *Cooper,* plaintiffs filed the Risch declaration alongside their March 1 *opposition* to BART's motion for summary judgment (3:22-cv-09193-WHA Dkt. No. 40-2). Returning to the present case, plaintiffs filed a request for judicial notice of the *Mitchell* and *Cooper* dockets on March 8, over a month after the close of summary judgment

briefing and well after oral argument (Dkt. No. 66). In the ordinary course, this order would refuse to consider the expert declaration. Nevertheless, in the interest of maintaining parity between the three related actions' records, this order addresses the substance of Dr. Risch's declaration filed in *Mitchell* and *Cooper*.

The Risch declaration functions as a rebuttal to BART's epidemiologist, Dr. Lewnard. Indeed, McClellan is not referenced whatsoever. Nor does Dr. Risch's declaration bring into dispute the substance of McClellan's opinion regarding the different risks posed by unvaccinated BART personnel and members of the public. Dr. Risch reproduces plaintiffs' train car position:

> In transit, the general ridership was not required to be vaccinated, thus contribution of BART employees to transmission *in vehicles* would on average have been small compared to the contribution of riders, and reductions in employee transmission generally would not have much changed transmission risks largely driven by the ridership.

(Dkt. No. 35-2 at 4, emphasis added). Again, McClellan's opinion does not live within the confines of the train car. She opines instead that co-occupation of a workplace for the duration of a working day or week presents a very different risk of exposure and transmission to BART personnel than does relatively brief exposure to the general public in train cars or other public spaces. The remainder of Dr. Risch's brief declaration takes issue with the efficacy of the vaccines themselves, rather than the relative risks posed by BART employees and the general public.

Plaintiffs further argue that *Tandon*, *Lukumi*, and *Roman Catholic Diocese of Brooklyn v. Cuomo* require this order to conclude that BART treated comparable secular conduct differently (Reply, 5). All are distinguishable.

"[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62 (citation omitted). In *Tandon*, the Supreme Court noted that "the Ninth Circuit did not conclude that [non-prohibited secular] activities pose a lesser risk of transmission than applicants' proposed religious exercise at home." *Id.* at 1297. Here, BART

13

has provided evidence of just that. *Lukumi* likewise rested on the "fail[ure] to prohibit nonreligious conduct that endanger[ed] [the asserted] interests in a similar or greater degree" than the prohibited religious conduct. 508 U.S. at 543-45. Nor are the facts here comparable to those in *Roman Catholic Diocese of Brooklyn v. Cuomo*, where a health department official testified that a large store could "literally have hundreds of people shopping there on any given day," while a nearby synagogue would be prohibited from hosting a mere fraction of that number. 141 S. Ct. 63, 66-67 (2020). Again, *Cuomo* makes no mention of facts showing that the risks posed by secular and religious gatherings varied based on duration of exposure or other transmission risk considerations.

Finally, BART asserts that its ability to bar a member of the public from its facilities is limited by Public Utilities Code Section 99171, which provides that "a transit district may issue a prohibition order to any person" when certain enumerated factors are met. Section 99171 further provides an administrative hearing process to those so barred. Refusal to vaccinate is not among the enumerated conditions under which a transit district may issue a prohibition. Plaintiffs do not address whether Section 99171 limits BART's ability to bar unvaccinated members of the public, or the impact of such a limitation on the analysis at hand. BART also argues that, even if possible, any such mandate targeted to the general public would be impossible to enforce given the nature of BART's services, namely the lack of ticket takers or other employees stationed at entry points (Opp. 21). This argument and its impact on general applicability likewise go unaddressed by plaintiffs.

In light of the above, the BART mandate and review process were neutral and generally applicable policies subject to rational basis review.

### D.    RATIONAL BASIS REVIEW

"Under rational basis review, [courts] must uphold [ ] rules if they are rationally related to a legitimate governmental purpose." *Stormans*, 794 F.3d at 1084. "The Chavez-Plaintiffs concede, for purposes of this motion, that stemming the spread of COVID-19 comprises a compelling state interest" (Br. 17). *Cuomo*, 141 S.Ct. at 67 ("Stemming the spread of COVID–19 is unquestionably a compelling interest."). "[R]equiring employees to be vaccinated is

14

rationally related to that interest because data show that approved COVID-19 vaccines drastically reduce the chances of contracting and spreading the virus." *UnifySCC*, 2022 WL 2357068, at *8; (Dkt. No. 51-3 at 8-10; Dkt. No. 51-4 at 5-6).   BART's mandate and exemption and accommodation process therefore satisfy rational basis review.  Considering the above, plaintiffs' motion for summary judgment of their Free Exercise claim is **DENIED**. Defendant's cross-motion for summary judgment is **GRANTED**.

### 2.   PLAINTIFFS' TITLE VII CLAIM.

To establish a Title VII failure-to-accommodate claim, plaintiffs must first show that "(1) [they] had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) [they] informed [BART] of the belief and conflict; and (3) [BART] discharged, threatened, or otherwise subjected [them] to an adverse employment action because of [their] inability to fulfill the job requirement."  *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004).  The burden then shifts to BART to show that it "initiated good faith efforts to accommodate reasonably the employee[s'] religious practices or that it could not reasonably accommodate the employee[s] without undue hardship."  *Ibid.*  (quoting *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998)).

As an initial matter, plaintiffs argue that BART's burden must be taken up in two consecutive steps:  "the employer must start by demonstrating that it made a good faith effort to accommodate the religious beliefs of the employee.  *After* proving that it made those good faith efforts and that the attempts were unsuccessful, the employer must show an undue hardship" (Reply 11).  Plaintiffs quote *Heller v. EBB Auto Co.*'s directive that "at a minimum, the employer [is] required to negotiate with the employee in an effort reasonably to accommodate the employee's religious beliefs" (Reply 12).  8 F.3d 1433, 1438 (9th Cir. 1993).  The argument goes:  no plaintiffs were offered accommodation, therefore no reasonable effort was made, therefore BART fails before ever reaching undue hardship (Reply 12).  However, the sentence immediately after the *Heller* passage quoted by plaintiffs reads:  "[t]he employer need not make such an effort if it can show that any accommodation would impose undue hardship."  8 F.3d at 1438.  That appears to be the argument that BART

15

intends to field at trial (Opp. 20, "[E]vidence establishes that accommodating unvaccinated employees would have imposed an undue hardship on BART").

### A. UNDUE HARDSHIP.

The *prima facie* showing is not in question for a majority of plaintiffs. This order therefore addresses BART's burden first. The undue hardship standard requires "context-specific application." *Groff v. DeJoy,* 600 U.S. 447, 473 (2023). "[C]ourts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Id*. at 470-471 (cleaned up). The inquiry requires consideration of a plaintiff's prior position, the availability of accommodations relative to that position, impacts on other employees, and the overall consequences of each of these facts on the conduct of BART's business.

BART asserts that it "can, and at trial will, establish that Plaintiffs could not be accommodated to work while unvaccinated without imposing a substantial burden on BART's operations . . . due to the increased risk of unvaccinated employees becoming infected with COVID-19" (Opp. 20). At this juncture, BART sets out its argument via the expert declarations of Joseph Lewnard, Professor of Epidemiology at UC Berkeley's School of Public Health, and Nancy McClellen, a certified industrial hygienist (Dkt. Nos. 51-3; 51-4). Therein, Lewnard and McClellan opine that unvaccinated workers posed health and safety risks to other employees and patrons, that they were more likely to take extended leaves from work due to more serious illness, and that they were more likely to infect others (*ibid*.). They further address the efficacy of a range of alternative countermeasures and their respective shortcomings absent vaccination (*ibid*.). Plaintiffs challenge those opinions with their own expert, Dr. Risch. This disagreement mitigates against summary judgment.

Deposition testimony further supports BART's argument that they conducted individualized assessments and concluded that risk of infection, transmission, and employee unavailability constituted an undue hardship. BART Manager of Leave Programs Rodney Maplestone, who participated in both exemption and accommodation reviews, testified that he

and his peers rendered a "case by case decision of each individual and their situation" (Dkt. No. 51-2). Maplestone likewise stated via declaration that each accommodation "was individually evaluated to determine if there was reasonable accommodation which could be provided which would allow them to perform their job duties and still ensure the safety of the public and other employees. The individual analysis relied on guidance from public health officials and agencies and reflected the critical need to maintain BART services and protect the public and employees" (Dkt. No. 51-2 at 4).

Whether a given accommodation would cause undue hardship is, in any case, a fact-intensive inquiry. The factual complexity in our action is compounded by plaintiffs' number and diversity. BART employs some 3,900 employees in 696 different job classifications, a majority of them members of one of five unions (Dkt. No. 51-2 at 4). Plaintiffs in this action are themselves drawn from over a dozen jobs. Maplestone stated that the accommodation analysis for each objector included consideration of different COVID-19 safety concerns and union "rules and provisions related to seniority, bidding and job assignments" (*ibid.*).

The record provides *some* insight into the accommodation considerations made in each plaintiff's case. The *Employee Request For Religious Exemption* form, which objectors submitted to begin the process, asked applicants to list any accommodations they would request should they be granted an exemption (Dkt. No. 46-2 at 329). BART's initial denial letters stated that all employee provided accommodation had been considered, and further provided a list of additional accommodations considered by BART, if any, and conclusions as to why such accommodations were not offered (Dkt. No. 46-2 at 266 - 268). In the case of plaintiff Engler-Contreras, for example, BART's initial accommodation denial stated that BART considered Engler-Contreras's proposed accommodations (remote work, weekly testing, an enclosed office space, the following of CDC guidelines, and temporary accommodation until retirement) (*ibid.*). BART also provided a list of further accommodations considered (including use of respirators, COVID-19 antibody testing, daily symptom screening, unpaid leaves of absences), and stated why it would not offer such accommodation. With regards to regular COVID-19 testing, for example, BART stated, *inter*

*alia*, that "the testing option does not achieve the safety standard set forth by the Board of Directors in the Vaccine Mandate Policy Statement" (*ibid*.). BART's initial accommodation denial also invited employees to suggest further accommodations for consideration (Dkt. No. 46-2 at 268). If additional accommodations were provided, they were discussed in BART's final rejection letters (Dkt. No. 46-2 at 263). This evidence supports BART's assertion that individualized evaluations took place, and that those evaluations determined that health risks associated with possible accommodations posed, in BART's view, an undue hardship.

That being said, these written exchanges provide a *limited* view of the interactive process and often contain only conclusions delivered via boilerplate language. The rest of the record provides little more. The deposition of Maplestone, for example, only discusses a single plaintiff's individual accommodation analysis in any detail, despite finding the time to delve into the details of various non-plaintiffs' exemption denials (Dkt. No. 46-2 at 211-216, 233-245). This dearth of detail militates against summary judgment. The "context-specific application" demanded by *Groff* will require BART's undue hardship claim to be tested against the dozen jobs at issue, if not against each employee's specific circumstance. For example, a train conductor's request may give rise to a different set of possible accommodations and attendant hardships than does that of a computer-bound administrator, and it is conceivable that BART's exposure and transmission theory will make out undue hardship as to the former, but not the latter. The presence of several discrete collective bargaining agreements further complicates – and individualizes – each inquiry.

Other evidence cuts against BART's position. For example, Rivera Badong Thomas, BART's Human Resources Director, testified that she was never told by BART management that unvaccinated employees would pose a danger of any kind (Dkt. No. 46-2 at 314). Seven plaintiffs state that they were temporarily called back to work after their accommodations were denied. Plaintiff Chavez, for example, states that he was called back to work in January of 2022 for approximately seven days (Dkt. No. 46-3 at 3). Plaintiff Contreras was called back to work for three days shortly after her forced retirement (Dkt. No. 46-4 at 3).

In sum, the record does not support summary judgment. Gaps in the record prevent the "context-specific application" demanded by *Groff*. Moreover, the parties have each mustered evidence supporting their competing views on undue hardship and the extent to which BART undertook the necessary individualized analysis. This order does not hold that BART has made an undue hardship showing as to any one plaintiff's accommodation request. Nor is it certain that BART's theory will win the day at trial. BART has, however, made out a genuine dispute, and the trial record, with the benefit of further testimony, may ultimately show that they have met their burden on all counts.

Plaintiffs attempt to side-step Title VII's individualized, fact-intensive inquiries via two group-wise arguments.

*First*, plaintiffs suggest that BART cannot establish an undue burden as a matter of law because they relied on pre-*Groff* EEOC guidelines and applied a *de minimis* standard. *See Groff v. DeJoy,* 600 U.S. 447 (2023). They could not have met the present standard, the argument goes, because it had not yet been handed down by the Supreme Court.

Plaintiffs' argument misreads *Groff*. *Groff* did not, and indeed declined to, remake the law. *Groff*, 600 U.S. at 471 ("[A] good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by our clarifying decision today."). To deem any denial of accommodations based on pre-*Groff* EEOC guidance a *per se* violation goes much farther than the Supreme Court did. *Id.* at 474 (Sotomayor, J., concurring) ("Petitioner Gerald Groff asks this Court to overrule *Hardison* and to replace it with a 'significant difficulty or expense' standard. The Court does not do so.") (citations omitted).

Plaintiffs also assert that *Groff* requires an employer to show that "accommodation would result in substantial increased costs," arguing that BART's position must fail because health risks "are not primarily financial reasons" (Reply 12-13). This, too, misreads *Groff*. The Supreme Court did not limit undue hardship to a dollars–and–cents showing. *Groff* recognized that Title VII requires "an assessment of a possible accommodation's effect on *'the conduct* of the employer's business,'" not the bottom line alone. *Groff*, 600 U.S. at 471 (quoting 42 U.S.C. § 2000e(j)). Relevant here, *Groff* re-affirmed that the standard takes into account an

United States District Court
Northern District of California

accommodation's impact on co-workers where such impact has "ramifications for the conduct of the employer's business." *Id.* at 472. The deprivation of other employees' bargained-for rights is one such impact that may support an undue hardship showing. *Hardison*, 432 U.S. 63, 79-81; *see Groff*, 600 U.S. at 475-6 (Sotomayor, J., concurring) ("Indeed, for many businesses, labor is more important to the conduct of the business than any other factor."). Increased health and safety risks – including risks to the continued operation of the business due to employee illness and death – may likewise impact the conduct of a business. Indeed, *several* post-*Groff* decisions have held that an employer can establish undue hardship by showing that accommodation posed a health and safety risk to other employees and thereby impacted the conduct of business. *Bordeaux v. Lions Gate Ent., Inc.*, No. 222CV04244SVWPLA, 2023 WL 8108655, at *13 (C.D. Cal. Nov. 21, 2023) ("Accommodating Plaintiff's exemption request would have put the lives of her fellow cast and crew members in danger . . . In and of itself, this safety risk constitutes an undue hardship."); *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929 (CS), 2023 WL 3467143, at *6 (S.D.N.Y. May 15, 2023) (recognizing "the obvious hardship associated with the increased health and safety risk posed to other employees and patients by allowing Plaintiffs to remain unvaccinated while working at their respective facilities"); *Kushner v. N.Y.C. Dep't of Educ.*, No. 22-cv-5265-DLI-VMS, 2023 WL 6214236, *5 (E.D.N.Y. Sept. 25, 2023) (" [C]reating a health and safety risk that would have prevented the DOE from fostering a safe educational and work environment . . . alone would have established an undue hardship . . . .").

*Second*, plaintiffs argue that the rate at which other local government employers granted exemptions and accommodations establishes that BART did not apply the correct standard, or perhaps did not undergo an accommodation process at all. The evidence relied upon consists of California Public Records Act requests to local government employers and their responses. The requests asked some variation of the following:

> Please provide records per the California Public Records Act as follows:
>
> 1. A writing/document that provides data on the number of Solano County employees who sought religious exemptions

for COVID-19 vaccination between January 1, 2021 and December 21, 2022.

2.  A writing/document that provides data on the number of employees who were granted religious accommodations to COVID-19 vaccination between January 1, 2021 and December 31, 2022.

(Dkt. No. 46-2 at 398-401). The response from Solano County, for example, reproduced the above questions and appended "= 23" to the end of the first and "=19 granted" to the end of the second (*ibid*.). No further context was requested or provided (*ibid*). The response from San Jose, meanwhile, stated that "we received 379 religious *exemption* requests from employees and approved 331," omitting the figure for *accommodations* (requested in question two) entirely (*id*. at 403). Plaintiffs argue that "[i]n bleak contrast [to other local government employers], BART employees went 0 for 189. If this were baseball, it is akin to a pitcher throwing seven perfect games in a row. Surely this cannot be viewed as fulfilling the obligation of seeking a reasonable accommodation" (Br. 19).

These figures, though circumstantial, may be relevant to the undue hardship determination. If admitted, they may even be persuasive to a jury. However, they do not dispose of the issue on summary judgment. *Fed. Trade Comm'n v. DirecTV, Inc.*, No. 15-CV-01129-HSG, 2016 WL 5339797, at *2 (N.D. Cal. Sept. 23, 2016) ("In deciding a summary judgment motion, the evidence is viewed in the light most favorable to the opposing party and all justifiable inferences are to be drawn in its favor."). Undue hardship requires a context-specific, fact-intensive inquiry. *Groff*, 600 U.S. at 473. That Solano County granted 82.2% of accommodation requests, without more, does not carry the day on summary judgment. Indeed, it is just as likely that Solano granted 82.2% of *exemptions* and 100% of the subsequent *accommodations* – there is simply no way to tell due to the wording of plaintiffs' requests and the terse response. These numbers provide no insight into any individual's occupation, the boundaries of their religious objection, the accommodations considered and granted, or the grounds on which those denied were not accommodated.

Moreover, BART employee depositions further dispute plaintiffs' assertion that BART engaged in an indiscriminate "purging [of] its rolls of religious employees" (Dkt. No.

54).  Maplestone testified that he was not told by anyone at BART that there "would be no . . . religious accommodations for the unvaccinated," and that accommodations were made by himself and HR Manager Gizelle Huynh, on a "case by case decision of each individual and their situation" (Dkt. No. 51-1 at 20).  Maplestone has provided a declaration stating the same (Dkt. No. 51-2).  In deposition, he further confirmed his understanding that CDC and EEOC guidelines, which BART states it followed, did not bar accommodations for the unvaccinated (Dkt. No. 46-2 at 208).  Huynh, asked why there were no religious accommodations granted, testified that "we looked at each individual case by case and saw if we were able to accommodate.  So I couldn't generalize of [*sic*] why as a whole they weren't [*sic*] all not accommodated" (Dkt. No. 51-1 at 32-33).  She also testified that there were no "communications, oral or otherwise, from BART management or the BART Board that . . . there was a preference not to give accommodations" (*id.* at 34-35).

To decide plaintiffs' Title VII claims on the basis of thin circumstantial evidence drawn from third parties (and in the face of BART's contrary evidence, discussed above) would run afoul of the Supreme Court's direction to engage in "context-specific application."  *Geoff*, 600 U.S. 447 at 473.

## B.    SIX PLAINTIFFS' PRIMA FACIE SHOWING.

Six plaintiffs – Rhiannon Doyle, Susan Richardson, Gema Espinoza-Carr, Tonya Lewis-Williams, Antonio Gonzalez, and Clifton Harrison – were denied exemptions and never reached the accommodation stage.  To prevail, they must make a *prima facie* showing that, *inter alia*, "[they] had a bona fide religious belief, the practice of which conflicts with an employment duty."  *Peterson*, 358 at 606.  Plaintiffs field two arguments on the matter.

*First*, plaintiffs assert that "BART cannot avoid summary judgment by the creation of a self-imposed factual dispute by claiming the denial was based on a lack of sincerity but elsewhere state that these employees' reasoning for seeking an exemption were secular and nonreligious" (Reply 10).  Plaintiffs conflate two discrete inquiries:  (1) whether a belief is sincerely held, and (2) whether a belief, sincere or not, is religious.  BART's exemption policy considered "whether [ ] the belief that prevented an employee's vaccination was religious,

22

rather than secular," but declined to then question the sincerity of those beliefs determined to be religious (Opp. 7). Those positions are both appropriate and consistent with one another. BART maintains that these six plaintiffs failed to make out a religious basis for objection.

*Second*, plaintiffs urge that the evidence on the issue is "complete," and ask that this order decide the issue as a matter of law (Reply 9). The parties' material dispute concerning undue burden forecloses on summary judgment of these claims, even if their *prima facie* burden is assumed to have been met. This order therefore declines to displace the jury's role as factfinder.

### 3. PLAINTIFFS' FEHA CLAIM.

FEHA provides, in relevant part, that:

> [i]t is an unlawful employment practice . . . [f]or an employer . . . to discharge a person from employment . . . because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer or other entity covered by this part demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance . . . but is unable to to reasonably accommodate the religious belief or observance without undue hardship . . . on the conduct of the business of the employer.

Cal. Gov't Code § 12940(*l*)(1).

Plaintiffs bear the initial burden of showing that "[1] the employee sincerely held a religious belief; [2] the employer was aware of that belief; and [3] the belief conflicted with an employment requirement." *California Fair Emp. & Hous. Com. v. Gemini Aluminum Corp.*, 122 Cal. App. 4th 1004, 1011 (2004). The burden then shifts to the employer to establish that "it initiated good faith efforts to accommodate or no accommodation was possible without producing undue hardship." *Soldinger v. Northwest Airlines, Inc.*, 51 Cal.App.4th 345, 370 (1996).

The Title VII and FEHA analyses follow a similar path. Summary judgment is inappropriate for the reasons stated in this order's Title VII analysis.

Plaintiffs' argument to the contrary asserts that FEHA's undue hardship standard borrows the ADA's standard (instead of Title VII), that this heightened "boutique requirement" is "grounded in the economic conditions of the employer," and that BART has failed to show undue hardship as a matter of law because it has presented few, if any, facts concerning the monetary costs of accommodation (Br. 2).

*First*, the ADA standard that plaintiffs argue "California borrows" is itself not limited to a dollars-and-cents showing. *US E.E.O.C. v. Placer ARC*, 114 F. Supp. 3d 1048, 1058 (E.D. Cal. 2015) ("Undue hardship refers not only to financial difficulty, but to reasonable accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business.") (internal quotation, citation omitted); *see US Airways, Inc. v. Barnett*, 535 U.S. 391, 400-401 (2002).

*Second*, plaintiffs' narrow interpretation does violence to the plain language of the statute, which directs courts to consider "*significant difficulty or* expense" including "the effect on expenses and resources *or the impact otherwise of these accommodations upon the operation of the facility*." Cal. Gov't Code § 12926(u); *In re Surface Min. Regul. Litig.*, 627 F.2d 1346, 1362 (D.C. Cir. 1980) ("It is, however, a fundamental principal [sic] of statutory construction that effect must be given, if possible, to every word, clause and sentence of a statute so that no part will be inoperative or superfluous, void or insignificant.") (cleaned up).

Our court of appeals has typically analyzed parallel claims under Title VII and FEHA according to Title VII case law. *Bolden-Hardge v. Off. of California State Controller*, 63 F.4th 1215, 1222 (9th Cir. 2023) ("Because FEHA is interpreted consistently with Title VII, our analysis of the federal and state claims is the same.") (internal quotation and citation omitted); *Ambat v. City & Cnty. of San Francisco*, 757 F.3d 1017, 1023 (9th Cir. 2014) ("Because FEHA is interpreted consistently with Title VII, we conduct our analysis of both federal and state claims according to Title VII case law.") (citation omitted). However, *Bolden-Hardge* declined to directly address the differences (if any) between FEHA and Title VII's undue hardship/burden standards.

*Bolden-Hardge*, 63 F.4th at 1227, n. 8 ("We also do not address whether the undue hardship analysis under FEHA differs from the analysis under Title VII.").

This order, like *Bolden-Hardge*, declines to address whether and how the undue hardship analysis under FEHA differs from the analysis under Title VII. It need not. It holds only that, in light of the plain text of the statute and its interpretation by California courts, undue hardship under FEHA is not strictly limited to monetary cost. Other "impact[s] . . . upon the operation of the facility," such as the health and safety risks posed by a deadly contagion, may support an undue hardship finding. Cal. Gov't Code § 12926(u).

BART has, for the reasons stated in this order's Title VII analysis, made out a genuine dispute as to undue hardship, foreclosing on summary judgment.

## CONCLUSION

For the reasons stated herein, plaintiffs' motion for summary judgment of plaintiffs' Free Exercise, Title VII, and FEHA claims is **DENIED**. Defendant's cross motion for partial summary judgment of plaintiffs' Free Exercise claim is **GRANTED**. As a result, plaintiffs' Title VII and FEHA claims will go to trial.

**IT IS SO ORDERED.**

Dated: March 18, 2024

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE