1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

10    GABRIEL CHAVEZ, et al.,

11                    Plaintiffs,                         No.  C 22-06119 WHA

12            v.

13    SAN FRANCISCO BAY AREA RAPID            **ORDER RE PLAINTIFFS' MOTION**
      TRANSIT DISTRICT,                        **IN LIMINE NO. 7**
14
                      Defendant.
15
     _____
16
                           **INTRODUCTION**

17         In this Title VII and FEHA failure-to-accommodate action plaintiffs, former employees

18    of defendant transit district, challenge the admissibility of defendant's expert industrial

19    hygienist.  For the reasons stated below, the motion to exclude is **DENIED**.

20

21                           **STATEMENT**

22         The facts underlying this action have been stated in full in prior orders (*see* Dkt. No. 72).

23    This order recounts only those facts relevant to the instant motion.

24         Plaintiffs, former employees of defendant BART, brought First Amendment, Title VII,

25    and FEHA claims against BART after losing their jobs due to their refusal to comply with

26    BART's COVID-19 vaccine mandate.  Plaintiffs' constitutional claims were summarily

27    adjudicated (Dkt. No. 72).  Their Title VII and FEHA claims are set to go to trial.

28         BART has disclosed, *inter alia*, the expert report of Nancy McClellan, an industrial

hygienist (Dkt. No. 92-2 at 4).  Expert McClellan holds a B.S. in Medical Technology from Michigan State University and a Master of Public Health with a focus on Industrial Hygiene from the University of Michigan.  She has worked as an industrial hygienist for some 25 years and is certified by the American Board of Industrial Hygiene.  She has served as the Chair of the American Industrial Hygiene Association, among other professional organizations, and currently serves on its Executive Board of Directors.  Ms. McClellan has worked as an industrial hygiene consultant or testifying expert in several industries, including car manufacturing, pharmaceuticals, ordinance storage and testing, agriculture, and others.  Expert McClellan has also worked on COVID-19.  She provided guidance on controls for COVID-19 transmission in airports and other facilities, as well as the efficacy of air filtration systems on airplanes.  She testified in a Florida state court matter as a "pandemic risk assessment subject matter expert," has delivered pandemic-related lectures to various professional organizations in the field, and has published on the topic in association with several professional organizations.

Expert McClellan's report can be divided into two parts.

*First*, Expert McClellan provides an overview of the "hierarchy of transmission/exposure controls," or simply the hierarchy of controls.  The National Institute for Occupational Safety and Health (NIOSH), cited in the McClellan report, describes the hierarchy of controls as "a way of determining which actions will best control exposures.  The hierarchy of controls has five levels of actions to reduce or remove hazards. The preferred order of action based on general effectiveness is: (1) Elimination (2) Substitution (3) Engineering controls (4) Administrative controls (5) Personal protective equipment (PPE)."  HIERARCHY OF CONTROLS, http://www.cdc.gov/niosh/topics/hierarchy/default.html.  The report considers each level of action in the context of the pandemic at the time of the BART mandate.  Because both elimination and substitution were not feasible, engineering controls (*e.g.*, vaccination, protective barriers, ventilation, office and equipment design) are deemed the "best feasible controls" then available to BART (Dkt. No. 92-2 at 13).  Administrative controls (*e.g.*, written policies and training concerning hand washing, distancing) and personal protective equipment (masks, gloves, face shields, *etc.*), meanwhile, were "a less effective approach to pathogen

United States District Court
Northern District of California

United States District Court
Northern District of California

control . . . because they rely on individuals to comply consistently and implement them effectively" (Dkt. No. 92-2 at 13-14).  The efficacy of PPE was further undermined when, in the throes of the pandemic, "non-healthcare organizations were directed to utilize lesser protective masks of varying types as an interim measure, despite their questionable protective efficacy" (Dkt. No. 92-2 at 14).  Expert McClellan opines that administrative and PPE controls were implemented *despite* "recognition of [their] poor effectiveness in reducing the transmission of an airborne, highly transmissible" virus because they presented "the only organizational approach available" prior to the dissemination of vaccines (Dkt. No. 92-2 at 14).

*Second*, the McClellan report performs a worksite risk assessment "derived from OSHA, ACGIH, AIHA, and NIOSH guidance" (Dkt. No. 92-2 at 14).  As an initial step, four work settings are identified:  "offices," "stations," "wayside," and "workshops"  (Dkt. No. 92-2 at 15).  Next, data regarding "industry type and setting," "the level of environmental administrative controls," "the quality of ventilation systems," and "the level of surface cleaning and disinfection," received from BART's facility engineering and occupational health and safety staff via a questionnaire, is used to determine the risk of exposure in each worksite (organized qualitatively from very high to high, medium, and low risk).  The report finds that, based on BART's provided data, BART's offices and workshops presented a "medium" risk of exposure, while stations and waysides ranked "high" (Dkt. No. 92-2 at 16-18).

The McClellan report concludes, based on the above, that "BART worksites were moderate to high in their COVID-19 transmission risk, warranting a vaccine mandate [and the expectation of] 100% compliance," and that "BART's interpretation of the feasibility of the less effective administrative and PPE controls as secondary to vaccination was correct according to the classic hierarchy of controls" (Dkt. No. 92-2 at 20).

Plaintiffs have now filed a *Daubert* motion seeking to exclude, or in the alternative limit, the testimony of Expert McClellan.  This order follows briefing and oral argument.

3

**ANALYSIS**

Under FRE 702, an expert witness may provide opinion testimony "if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact issue; (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case." FRE 702.

The *Daubert* standard outlines the scope of the district court's role as gatekeeper:

> [F]aced with a proffer of expert scientific testimony, the trial judge, in making the initial determination whether to admit the evidence, must determine whether the expert's testimony reflects (1) "scientific knowledge," and (2) will assist the trier of fact to understand or determine a material fact at issue. This requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1227–28 (9th Cir. 1998) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (internal quotation marks and citation omitted). The party offering the expert testimony must show by a preponderance of the evidence that it meets the requirements of reliability and helpfulness to the trier of fact. *Daubert*, 509 U.S. at 592 n.10. That being said, "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588).

Expert McClellan's testimony passes muster under FRE 702 and *Daubert*.

*First*, Expert McClellan's testimony is relevant. "The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Messick*, 747 F.3d at 1196 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir.1995)). The McClellan report is relevant to issues central to BART's burden under

4

United States District Court
Northern District of California

1    both Title VII and FEHA.  To meet its burden under Title VII, BART must show that

2    accommodating unvaccinated employees would have imposed an undue hardship on BART.

3    *Huller v. EBB Auto Co.*, 8 F.3d 1433, 1438, 1440 (9th Cir. 1993).  FEHA requires a similar

4    showing.  *Soldinger v. Northwest Airlines, Inc.*, 51 Cal.App.4th 345, 370 (1996).

5        As a result, the jury will be tasked with determining the feasibility of, and hardship

6    associated with, alternative exposure controls.  Plaintiffs' summary judgment briefing on the

7    issue, for example, argued at length that administrative controls (such as testing, work from

8    home, social distancing) and PPE (masks, gloves, face shields, *etc.*) constituted reasonable

9    accommodations that did not present an undue hardship to BART (Dkt. No. 46 at 16-19).

10   Expert McClellan squarely addresses the issue in her report.  First, she establishes the general

11   efficacy of various exposure controls via the hierarchy of controls.  She then contextualizes

12   that hierarchy, describing how the pandemic at the time of BART's mandate further limited the

13   efficacy of controls such as PPE.  The McClellan report ultimately concludes that engineering

14   controls, such as vaccination, constituted the best feasible controls during the pandemic and

15   that, in light of her worksite risk assessment, "BART's interpretation of the feasibility of the

16   less effective administrative and PPE controls as secondary to vaccination was correct" (Dkt.

17   No. 92-2 at 20).

18       *Second*, Expert McClellan's testimony is sufficiently reliable.  "The reliability threshold

19   requires that the expert's testimony have 'a reliable basis in the knowledge and experience of

20   the relevant discipline.'"  *Messick*, 747 F.3d at 1197 (quoting *Kumho Tire Co. v. Carmichael*,

21   526 U.S. 137, 148 (1999)).  The contents of both the McClellan report and the sources cited

22   therein suggest that the methods underpinning Expert McClellan's analysis – namely the

23   hierarchy of controls and worksite risk assessment – are common to the field of industrial

24   hygiene.  The data used in that analysis, meanwhile, consists of (1) COVID-19's risks and

25   associated exposure controls as understood at the time of the mandate, drawn from public

26   guidance issued by the CDC and other public health organizations, and (2) data about specific

27   worksite conditions collected from BART facility engineering and occupational health and

28   safety staff, which informed the report's worksite risk assessment.

1    In sum, Expert McMillan's specialized knowledge will help the jury determine fact issues

2    related to defendant's burden at trial.  Her testimony is based on sufficient facts and data and is

3    the product of reliable principles and methods applied to the relevant facts of the case.

4    Plaintiffs' various arguments to the contrary, addressed below, do not move the needle.

5    *First*, plaintiffs argues that Expert McClellan is not an expert in a cognizable field:  she

6    is, instead, an "all-purpose expert" "market[ed] . . . in many divergent areas loosely

7    categorized as industrial health" (Dkt. No. 92 at 4).  As an initial matter, industrial hygiene is a

8    well-established field of practice, not an invention for this lawsuit.  Numerous courts have

9    admitted testimony from industrial hygienists.  *See, e.g., Romero v. Garland*, No.

10   319CV02138JAHBGS, 2024 WL 1099300 (S.D. Cal. Mar. 13, 2024);  *Alsadi v. Intel Corp.*,

11   519 F. Supp. 3d 611 (D. Ariz. 2021); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180

12   F. Supp. 2d 584 (D.N.J. 2002), *aff'd*, 68 F. App'x 356 (3d Cir. 2003).  Section 1910.1000 of

13   Title 29, which sets maximum limits for employee exposure to myriad air contaminants,

14   requires employers' administrative, engineering, and PPE controls to be "approved for each

15   particular use by a competent *industrial hygienist* or other technically qualified person."  29

16   C.F.R. § 1910.1000(e).  The American Board of Industrial Hygiene acts as a certifying body

17   and has certified Expert McClellan.  There are numerous reputable professional organizations

18   in the field, and Expert McClellan has occupied a leadership role in many of them.

19   But she is not the right *kind* of industrial hygienist, plaintiffs retort:  she is an expert "in

20   the automotive industry, agriculture, military explosives, chemicals used in factories, or

21   soldering circuit boards," but lacks expertise in COVID-19, vaccines, or transit agencies.  In

22   counsel's terms, she is "an orthopedic surgeon testifying about cardiology."  But "there is no

23   requirement that an expert be a specialist in a given field, and [ ] any lack of particularized

24   expertise goes to the weight accorded [to her testimony], not to the admissibility of her opinion

25   as an expert." *Marshall v. RS 2018 Float, LLC*, No. 22-35899, 2024 WL 637487, at *1 (9th

26   Cir. Feb. 15, 2024) (cleaned up).  The same goes for doctors: "[t]he fact that [a] physician is

27   not a specialist in the field in which he is giving his opinion affects not the admissibility of his

28

United States District Court
Northern District of California

1    opinion but the weight the jury may place on it." *Mitchell v. United States*, 141 F.3d 8, 15 (1st

2    Cir. 1998) (quoting *Payton v. Abbott Labs,* 780 F.2d 147, 155 (1st Cir.1985)).

3        Moreover, plaintiffs' characterization of Expert McClellan's experience omits key

4    details.  Expert McClellan has significant prior experience with COVID-19, described

5    above.  Plaintiffs' counsel characterized this as a recent "pivot to remake herself as a COVID-

6    19 expert."  But the pandemic was a recent event.  To demand pandemic-related expertise

7    predating the pandemic asks for too much.  As to transit facilities, Expert McClellan, in her

8    role as a consultant with ABM, provided advice related to COVID-19 transmission controls in

9    aviation.

10       In any event, plaintiffs' assertion that industrial hygienists are so finely specialized as to

11   require a "transit industrial hygienist" as opposed to an "ordinance testing industrial hygienist"

12   is unsupported.  Courts that have admitted expert testimony from industrial hygienists, cited

13   above, have not drawn such hard industry-specific lines.  Turning to Expert McClellan's

14   resume, her breadth of experience, described above, further belies the notion that her field is

15   narrowly siloed by industry expertise.  For example, Expert McClellan recently worked in an

16   agricultural case involving the death of a farmer inside a milk tank (Dkt. No. 92 at 4).  She

17   testified that she has not otherwise consulted or testified in the agriculture industry (Dkt. No.

18   92-1 at 5).  Nevertheless, plaintiffs state that Expert McClellan "undoubtedly possesses

19   considerable knowledge and even expertise" in the agriculture industry, among others (Dkt.

20   No. 92 at 4).  That concession is in serious tension with plaintiffs' demand for narrowly

21   tailored, worksite-specific experience.

22       During oral argument, counsel argued that allowing Expert McClellan to testify while

23   excluding plaintiffs' evidence concerning other employers' COVID-19 accommodations would

24   create a "double standard."  Not so.  As an initial matter, plaintiffs' "other employer" evidence

25   was excluded due to their failure to make timely Rule 26 disclosures.  Moreover, counsel's

26   argument draws a false equivalence.  The McClellan report suggests, and BART's counsel has

27   confirmed, that Expert McClellan's testimony will be strictly limited to BART's own

28   worksites.  That is, she will not be used to introduce evidence regarding the policies and

United States District Court
Northern District of California

7

practices of employers not party to this litigation, as plaintiffs sought to do.  The mere fact that

Expert McClellan's opinions come after 25 years of experience in various industrial contexts is

not legitimate grounds for exclusion.  Returning to plaintiffs' medical analogy, an emergency

room physician's broad-based experience with all forms of injury is not fatal to her ability to

testify, as a medical doctor, to the nature of a particular injury or diagnosis.  In that connection,

Expert McClellan's direct examination will be limited to the content of her report, which

concerns BART's facilities alone.  BART's counsel must take care not to elicit testimony

beyond the four corners of that report during direct examination.

  *Second*, plaintiffs attack the legitimacy of Expert McClellan's method:  "Ms. McClellan

claims that . . . the hierarchy of controls, is the same regardless of whether pickles are being

made, bombs are being blown up, automotive parts [are] being made or pharmaceuticals [are]

being manufactured. . . . This proves too much" (Dkt. No. 92 at 3).  Plaintiffs' appeal to

common sense is made without supporting evidence.  What the Court found, meanwhile,

confirms Expert McClellan's position.

  The hierarchy of controls is "an ingrained part of OSHA's regulatory framework" for air

contaminants in the workplace, and has been codified in Title 29's Occupational Safety and

Health Standards.  *Am. Iron & Steel Inst. v. Occupational Safety & Health Admin.*, 182 F.3d

1261, 1265 (11th Cir. 1999).  While our own court of appeals has not discussed the ubiquity of

the hierarchy at length, the Seventh Circuit has:

> Since 1971, OSHA regulations have required facilities with excess
> [air contaminants] to use engineering or administrative controls
> whenever feasible to attain compliance with the [permissible
> exposure limits].  Only when feasible engineering or
> administrative controls are insufficient to bring [contaminants]
> levels below the [permissible exposure limits] may a company turn
> to individualized protective equipment to supplement those
> controls.  This hierarchy of controls privileges engineering and
> administrative controls because they make respiratory protection
> automatic, while respirators are dependent on use and constant
> attention and are subject to human error.

*Chao v. Gunite Corp.*, 442 F.3d 550, 553 (7th Cir. 2006) (internal quotation marks and

citations omitted); *see also Pub. Citizen Health Rsch. Grp. v. U.S. Dep't of Lab.*, 557 F.3d 165,

United States District Court
Northern District of California

8

176 (3d Cir. 2009), *as amended* (May 15, 2009) (discussing OSHA's use of the hierarchy of controls to limit exposure). Those OSHA standards govern myriad workplaces and industries. *See Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*, 965 F.2d 962, 968 (11th Cir. 1992). The same is true of lead standards, which also require employers to meet prescribed exposure limits through a hierarchy of controls policy. *Advance Bronze, Inc. v. Dole,* 917 F.2d 944, 947 (6th Cir.1990); 29 C.F.R. § 1910.1025(e)(1)(i). That standard applies to "*all* occupational exposure to lead," with narrow exceptions for specific construction industry and agricultural operations. 29 C.F.R. § 1910.1025(a) (emphasis added). NIOSH guidance cited by Expert McClellan further confirms that the hierarchy of controls is broadly applicable to various worksites and exposures, ranging from toxic chemicals and air contaminants to heavy objects, sharp tools, and harmful inks. Hierarchy of Controls, http://www.cdc.gov/niosh/topics/hierarchy/default.html. Courts, meanwhile, have admitted and relied upon expert testimony regarding the hierarchy of controls in varied workplaces, *e.g.*, computer chip fabs and coke producing plants. *Alsadi*, 519 F. Supp. 3d at 621; *City of Toledo v. Beazer Materials & Servs., Inc.*, No. 90-CV-7344, 1995 WL 770396, at *68 (N.D. Ohio June 14, 1995), *as clarified* (Aug. 29, 1995).

All of the above supports Expert McClellan's assertion that the hierarchy of controls is "the fundamental principle for how [industrial hygienists] go about any biological chemical or physical exposure [and] how to address it" (Dkt. No. 92-2 at 38).

Plaintiffs related concern – that the ubiquity of the hierarchy of controls will confuse the jury in this "context-specific accommodation case" – is unwarranted (Dkt. No. 92 at 3). As discussed above, the McClellan report does not merely state the basic principle: it employs the hierarchy of controls in a fact-intensive analysis of the specific worksites at issue in this action and gives context to the controls available to BART in light of the state of the pandemic and the information then known about the virus.

*Third*, plaintiffs advance a number of arguments attacking Expert McClellan's "lack of firsthand knowledge" (Dkt. No. 92 at 5). These cut no figure: "[u]nlike an ordinary witness,

9

1   see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not

2   based on firsthand knowledge or observation. See Rules 702 and 703." *Daubert*, 509 U.S. at

3   592.  Moreover, plaintiffs' suggestion that Expert McClellan should have contacted each

4   individual plaintiff prior to preparing her report cuts against the norms of expert practice.

5         At bottom, each of plaintiffs' arguments misunderstands the scope of the *Daubert*

6   inquiry:

> The *Daubert* duty is to judge the reasoning used in forming an
> expert conclusion.  The test is whether or not the reasoning is
> scientific and will assist the jury.  If it satisfies these two
> requirements, then it is a matter for the finder of fact to decide
> what weight to accord the expert's testimony . . . Disputes as to the
> strength of an expert's credentials, faults in his use of a particular
> methodology, or lack of textual authority for his opinion go to the
> weight, not the admissibility, of his testimony.

*Kennedy,* 161 F.3d at 1230-31 (cleaned up).  Plaintiffs have identified various grounds for

"[v]igorous cross-examination," not exclusion.  *Daubert*, 509 U.S. at 596.

## CONCLUSION

Plaintiffs' motion to exclude Expert McClellan is **DENIED**.

**IT IS SO ORDERED.**

Dated:  June 21, 2024

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE