1   GLYNN, FINLEY, MORTL,
    HANLON & FRIEDENBERG LLP
2   JAMES M. HANLON, JR., Bar No. 214096
    VICTORIA R. NUETZEL, Bar No. 115124
3   DAWSON P. HONEY, Bar No. 347217
    One Walnut Creek Center
4   100 Pringle Avenue, Suite 500
    Walnut Creek, CA 94596
5   Telephone: (925) 210-2800
    Facsimile: (925) 945-1975
6   jhanlon@glynnfinley.com
    vnuetzel@glynnfinley.com
7   dhoney@glynnfinley.com

8   SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT
    OFFICE OF THE GENERAL COUNSEL
9   SAM N. DAWOOD, Bar No. 178862
    2150 Webster St., 10th Floor
10  Oakland, CA 94612
    Telephone: (510) 464-6023
11  Facsimile: (510) 464-6049
    sdawood@bart.gov
12
    Attorneys for Defendant
13  San Francisco Bay Area Rapid Transit District

14                  UNITED STATES DISTRICT COURT

15                  NORTHERN DISTRICT OF CALIFORNIA

16
                                    )   Case No. 3:22-cv-06119-WHA
17  TONYA LEWIS-WILLIAMS, RAYMOND  )
    LOCKETT, BRADFORD MITCHELL,     )   Consolidated Cases:
18  ROSALIND PARKER, RYAN RIVERA,   )   Case No. 3:22-cv-09193-WHA
    SZU CHENG SUN,                  )   Case No. 3:22-cv-07720-WHA
19                                  )
                Plaintiffs,         )   DEFENDANT'S MOTION FOR
20                                  )   JUDGMENT AS A MATTER OF LAW
        vs.                         )   (FRCP 50) OR, IN THE
21                                  )   ALTERNATIVE, FOR A NEW TRIAL
    SAN FRANCISCO BAY AREA RAPID    )   (FRCP 59)
22  TRANSIT DISTRICT,               )
                                    )   Hearing date:  December 11, 2024
23              Defendant.          )   Hearing time:  8:00 a.m.
                                    )
24                                  )
                                    )
25  _____)

26

27

28

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND MOTION ....................................................................................1

II. RELEVANT TRIAL RECORD ......................................................................................1

   A.   BART's Affirmative Defense:  Reasonable Accommodation
      Without Undue Hardship .....................................................................................1

      1.  BART Introduced Undisputed Evidence Concerning the Severe State of the
          Pandemic and Its Impact on BART ...........................................................1

      2.  BART Presented Undisputed Evidence that Permitting a Plaintiff to
          Continue to Work in Person While Unvaccinated Would Increase
          the COVID-19 Health and Safety Risk for Others ....................................2

          a.  BART Relied on Public Health Guidance that Vaccination
              Was More Effective to Protect Workers and Patrons than
              Other Interventions ......................................................................2

          b.  BART Presented Expert Scientific Testimony that Reiterated
              the Public Health Guidance at Relevant Times and Explained
              the Bases for It ..............................................................................4

          c.  Plaintiffs Presented No Contrary Evidence Concerning the
              Public Health Guidance, and Made a Strategic Decision to
              Present No Expert Scientific Evidence ........................................7

      3.  The Trial Evidence Established that Plaintiffs Could Not Perform
          Their Essential Job Duties Remotely ........................................................8

      4.  Plaintiffs Referenced Unpaid Leave Policies, but BART Submitted
          Undisputed Evidence that Any Leave for Refusal to
          Comply with the Vaccination Policy Would Have Been Indefinite ...............11

   B.   Plaintiffs' Counsel Intentionally and Repeatedly Violated a Critical
      In Limine Ruling...............................................................................................12

III. ARGUMENT ..............................................................................................................13

   A.   Standard for Judgment as a Matter of Law Under Rule 50(b)............................13

   B.   Standard for a New Trial Under Rule 59 ...........................................................14

   C.   BART's Affirmative Defense ............................................................................15

      1.  BART Is Entitled to Judgment as a Matter of Law .................................15

          a.  BART Established as a Matter of Law That Permitting a
              Plaintiff to Continue Working in Person While Unvaccinated
              Would Have Imposed an Undue Burden ....................................15

1

**TABLE OF CONTENTS**
Continued

2

3    b.  BART Established as a Matter of Law that Each Plaintiff
       Could Not Perform Their Essential Job Duties Remotely .........................19

4    c.  BART Established as a Matter of Law that Unpaid Leave
5        Was Unavailable as a Potential Accommodation .....................................20

6    2.  Were BART Not Entitled to Judgment as a Matter of Law,
       the Court Should Grant a New Trial ............................................................21

7
    D.  Repeated, Prejudicial Misconduct by Plaintiffs' Counsel Requires
8       that the Court Order a New Trial ...........................................................................21

9    1.  Law Governing New Trial Based on Attorney Misconduct .........................21

10   2.  The Court's In Limine Order .......................................................................22

11   3.  Plaintiffs' Counsel Intentionally and Repeatedly Violated the
       In Limine Order, Even After the Court Ruled BART Had Not
12      "Opened the Door" ......................................................................................22

13   4.  The Court Could Not Un-Ring the Bell, and Its Comments to the
       Jury Inadvertently Increased the Prejudice to BART ..................................23

14
15   5.  BART Is Entitled to a New Trial .................................................................24

16  IV.  CONCLUSION ............................................................................................................25

17

18

19

20

21

22

23

24

25

26

27

28

DEF'S MTN. FOR JMOL OR, IN THE ALTERNATIVE, FOR NEW TRIAL

1

# TABLE OF AUTHORITIES

2

3

<u>CASES</u>

4

*Anheuser-Busch, Inc. v. Natural Beverage Distributors*
    69 F.3d 337 (9th Cir. 1995) ................................................................. 21

5

6

*Bird v. Glacier Electrical Cooperative, Inc.*
    255 F.3d 1136 fn.16 (9th Cir. 2001) ................................................. 21

7

*Chesapeake & Ohio Railway Co. v. Martin*
    283 U.S. 209 (1931) ................................................................ 16, 17

8

9

*Chicago, Rock Island & Pacific Railway Co. v. Howell*
    401 F.2d 752 (10th Cir. 1968) ......................................................... 16

10

*City of Pomona v SQM North America Corp.*
    750 F.3d 1036 (9th Cir. 2014) ......................................................... 17

11

12

*Cunningham v. Wong*
    704 F.3d 1143 (9th Cir. 2013) ......................................................... 24

13

*Dark v. Curry County*
    451 F.3d 1078 (9th Cir, 2006) ......................................................... 20

14

*Escriba v. Foster Poultry Farms, Inc.*
    743 F.3d 1236 (9th Cir. 2014) ......................................................... 14

15

16

*Fisher v. City of San Jose*
    558 F.3d 1069 (9th Cir. 2009) ......................................................... 14

17

*Garcia-Ayala v. Lederle Parenterals, Inc.*
    212 F.3d 638 (1st Cir. 2000) ........................................................... 20

18

19

*Hemmings v. Tidyman's Inc.*
    285 F.3d 1174 (9th Cir. 2002) ......................................................... 22

20

21

*Herrmann v. Salt Lake City Corp.*
    21 F.4th 666 (10th Cir. 2021) ......................................................... 20

22

23

*Imperium IP Holdings (Cayman) Ltd. v. Samsung Electrical Co., Ltd.*
    757 Fed. Appx. 974 (Fed. Cir. 2019) ............................................... 18

24

*In re RFC and ResCap Liquidating Trust Action*
    399 F. Supp. 3d 804 (D. Minn. 2019) ............................................. 18

25

26

27

28

DEF'S MTN. FOR JMOL OR, IN THE ALTERNATIVE, FOR NEW TRIAL

1

## TABLE OF AUTHORITIES

2

Continued

3

*Landes Construction Co., Inc. v. Royal Bank of Canada*
833 F.2d 1365 (9th Cir. 1987) ....................................................................... 14

4

5

*LeBarron v. Interstate Group, LLC*
529 F. Supp. 3d 1163 (D. Nev. 2021) .......................................................... 20

6

*Makor v. Burlington Northern Santa Fe Railway Co.*
680 Fed. Appx. 542 (9th Cir. 2017).............................................................. 20

7

8

*NewSCI, Inc. v. Staffing 360 Solutions, Inc.*
865 F.3d 251 (5th Cir. 2017) ......................................................................... 18

9

*Pease v. Production Workers Union of Chicago*
Case No. 02 C 6756, 2004 WL 526369 (N.D. Ill. March 15, 2004)............... 17

10

11

*Quinn v. Southwest Wood Products, Inc.*
597 F.2d 1018 (5th Cir. 1979) ....................................................................... 17

12

*Quintana-Ruiz v. Hyundai Motor Corp.*
303 F.3d 62 (1st Cir. 2002)...................................................................... 17, 18

13

14

*Reeves v. Sanderson Plumbing Products, Inc.*
530 U.S. 133 (2000)................................................................................. 13, 14

15

*Security-First National Bank of Los Angeles v. Lutz*
322 F.2d 348 (9th Cir. 1963) ......................................................................... 17

16

17

*Selle v. Gibb*
741 F.2d 896 (7th Cir. 1984) ......................................................................... 16

18

19

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*
251 F.3d 814 (9th Cir. 2001) .................................................................... 14, 21

20

*Sip-Top, Inc. v. Ekco Group, Inc.*
86 F.3d 827 (8th Cir. 1996) ........................................................................... 14

21

22

*Winarto v. Toshiba America Electronics Components, Inc.*
274 F.3d 1276 (9th Cir. 2001) ....................................................................... 14

23

24

*Wood v. Green*
323 F.3d 1309 (11th Cir. 2003) ..................................................................... 20

25

26

27

28

DEF'S MTN. FOR JMOL OR, IN THE ALTERNATIVE, FOR NEW TRIAL

1

**TABLE OF AUTHORITIES**
Continued

2

3

4    RULES

5    Federal Rule of Civil Procedure
        Rule 50 ......................................................................................................... *passim*
6        Rule 59 .......................................................................................... 1, 14, 21, 25

7

8    OTHER AUTHORITIES

9    Wright & Miller, Federal Practice and Procedure § 2806, at 48-49 (1973) .................................. 14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEF'S MTN. FOR JMOL OR, IN THE ALTERNATIVE, FOR NEW TRIAL

**I.      Introduction and Motion**

Defendant San Francisco Bay Area Rapid Transit District ("BART") moves pursuant to Federal Rule of Civil Procedure 50 for judgment as a matter of law or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59.  The grounds of BART's motion are as follows:

- BART is entitled to judgment as a matter of law on the affirmative defense that it could not reasonably accommodate the Plaintiffs to continue working while unvaccinated without suffering an undue burden, specifically an increased COVID-19 health and safety risk for others at its facilities.  Were BART not entitled to judgment as a matter of law, the Court should order a new trial because the jury's verdict is against the clear weight of the evidence and a miscarriage of justice.

- Were BART not entitled to judgment as a matter of law on its affirmative defense, which would resolve all claims, then BART would be entitled to a new trial on all issues due to Plaintiffs' counsel's intentional, repeated violations of the Court's in limine order concerning requests for exemption and accommodation not in suit.

This motion is based on the trial transcript and admitted evidence, as cited herein.  BART provides a compendium of the cited exhibits, all admitted, for the Court's convenience.

**II.     Relevant Trial Record**

**A.      BART's Affirmative Defense:  Reasonable Accommodation Without Undue Hardship**

**1.      BART Introduced Undisputed Evidence Concerning the Severe State of the Pandemic and Its Impact on BART**

BART presented uncontroverted, unimpeached testimony concerning the severe state of the COVID-19 pandemic when it made the accommodation decisions at issue:

BART's Board of Directors passed a COVID-19 employee vaccination requirement on October 14, 2021.  (Exs. 10, 304; Tr. 420:12-18.)  Employees were required to be fully vaccinated by December 13, 2021.  (*Id.*)  Plaintiffs' religious exemption and accommodation requests were resolved by February 2022.  (Exs. 124, 196, 200, 361, 383, 393.)

///

DEF'S MTN. FOR JMOL OR, IN THE ALTERNATIVE, FOR NEW TRIAL

1    From October 2021 through early 2022, COVID-19 was a very serious public health

2    problem.  (Tr. 217:25-218:8.)  In fact, this period was the peak of the pandemic with respect to

3    the number of hospitalizations and infections in California and nationwide.  (*Id.*)  The SARS-

4    CoV-2 variants circulating at that time were the most problematic encountered during the entire

5    pandemic.  (Tr. 220:2-13.)  The Delta variant, then circulating, had a higher risk of transmission

6    than other variants seen to that point, and the highest risk of causing hospitalization and death.

7    (*Id.*)  It was surpassed by the Omicron variant, which had even greater potential for transmission.

8    (*Id.*)  Across the population, the risk for an unvaccinated and as-yet-uninfected person to die if

9    they contracted the Delta variant was about 2 percent.  (Tr. 220:14-221:7.)  The Delta variant

10   presented a risk of death about 40 times greater than measles, a disease for which California

11   requires vaccination for children to attend school in person.  (Tr. 222:21-223:21.)

12   BART's ridership was greatly affected by the pandemic, dropping as much as 94%.

13   (Tr. 414:22-415:8.)  Three BART employees died as a result of COVID-19.  (Tr. 415:13-21.)

14   Five other BART employees became seriously ill due to COVID-19 and required hospitalization.

15   (Tr. 415:24-416:4.)  In 2021, BART lost approximately 550,000 hours of employee time due to

16   COVID-related illnesses.  (Tr. 416:5-8, 430:15-24.)  The State of California declared BART's

17   employees to be essential workers (Tr. 365:11-14), so BART lost more than half a million

18   essential worker hours to COVID-related illnesses in 2021.  BART had approximately

19   4,230 employees (Tr. 414:13-16), so it lost about 130 hours per worker in 2021 to COVID-19

20   related illnesses.

21   **2.      BART Presented Undisputed Evidence that Permitting a Plaintiff to
          Continue to Work in Person While Unvaccinated Would Increase the**

22   **COVID-19 Health and Safety Risk for Others**

23   **a.      BART Relied on Public Health Guidance that Vaccination
              Was More Effective to Protect Workers and Patrons than**

24   **Other Interventions**

25   BART witnesses presented uncontroverted, unimpeached testimony concerning the

26   agency's reliance on public health guidance concerning COVID-19 health and safety, including

27   when implementing the employee vaccination requirement:

28   *///*

1    Robert Powers, BART's General Manager, testified that BART routinely consulted

2    communications from the Centers for Disease Control, county health professionals, and the

3    State of California concerning best practices for pandemic risk management. (Tr. 426:8-427:5.)

4    Powers testified that this guidance reported that vaccination helped prevent getting COVID-19,

5    lowered the risk of transmitting COVID-19 if infected, and decreased the risk of serious health

6    impacts. (*Id.*)

7    Jeff Lau, BART's Chief Safety Officer, testified that BART formed a COVID response

8    task force, which he headed. (Tr. 354:24-355:11.) The task force consulted an infectious disease

9    expert at the University of California at Berkeley, Dr. John Swartzberg, and communicated with

10    many different public health officials at the county level. (Tr. 356:2-20.) BART held weekly

11    status meetings with public health officials from the five counties in which it operates (Alameda,

12    Contra Costa, San Francisco, San Mateo, Santa Clara). (*Id.*) BART relied heavily on

13    information promulgated by the California Department of Public Health, and consulted

14    information disseminated by the federal Centers for Disease Control. (Tr. 356:24-357:13.)

15    When the employee vaccination requirement was passed, vaccination was the most

16    recommended action that individuals could take to protect themselves and their families against

17    COVID-19. (Tr. 384:5-10.) From Lau's perspective as Chief Safety Officer, based on

18    public health guidance, from October 2021 through February 2022 vaccination was the best

19    course of action to protect the safety of employees and the public. (Tr. 387:2-8.)

20    Rodney Maplestone, BART's Manager of Leave Programs, testified that BART engaged

21    with each employee to determine what accommodation could be granted that would permit the

22    employee to perform the essential functions of their job safely and effectively and not place an

23    undue burden on BART. (Tr. 468:25-469:9.) In making this assessment, BART required that

24    any potential accommodation would have to be as safe as vaccination, which was the safety

25    standard recommended by the Centers for Disease Control. (Tr. 469:19-470:4, 484:23-485:3,

26    502:7-16.) BART could not approve an accommodation that would result in a condition that was

27    less safe for any other BART employee or rider. (Tr. 470:20-24.) Applying that standard,

28    BART could not identify any acceptable accommodation short of an employee not coming on

1    BART property at all.  (Tr. 470:20-24, 502:7-16.)  BART considered other interventions, like

2    masking, but those were not acceptable because Centers for Disease Control guidance stated that

3    vaccination offered the safest protection.  (Tr. 470:10-19.)  The same was true for regular

4    temperature checks and testing – BART looked to public health guidance, including from the

5    Centers for Disease Control, which reported that such alternatives did not meet the same health

6    and safety standard as vaccination.  (Tr. 474:24-475:9.)

7                        **b.    BART Presented Expert Scientific Testimony that Reiterated
                              the Public Health Guidance at Relevant Times and Explained
8                              the Bases for It**

9            BART presented expert testimony from Dr. Joseph Lewnard, an infectious disease

10   epidemiologist on faculty at the University of California at Berkeley.  Dr. Lewnard's

11   curriculum vitae was admitted as Exhibit 419, and his credentials were covered at pages 208

12   through 214 of the trial transcript.  Dr. Lewnard spent approximately 100 hours on his

13   assignment, which was to address potential alternatives to vaccination available to BART as it

14   implemented its employee vaccine requirement and considered the plaintiffs' requests for

15   religious exemption and accommodation.  (Tr. 217:13-24.)

16           Dr. Lewnard testified that at the relevant period, October 2021 through early 2022, the

17   public health community knew that the available vaccines were substantially effective at

18   preventing a vaccinated person from being infected with SARS-CoV-2; indeed, randomized

19   trials showed that the vaccines were about 94 to 95 percent effective at preventing people from

20   having a SAR-CoV-2 infection with at least one symptom.  (Tr. 223:22-224:14.)  These data

21   indicated that a vaccinated person had only about 1 in 20 risk of infection compared with

22   someone not vaccinated.  (*Id.*)

23           Dr. Lewnard testified that at this time the public health community had strong evidence

24   that vaccination reduced a person's chance of transmitting infection.  (Tr. 224:15-225:6.)

25   Household studies had shown that vaccinated parents were 72 percent less likely to transmit

26   COVID-19 infection to their children.  (*Id.*)  Such household studies are a preferred unit for

27   epidemiological analyses like these and were the first setting where scientists could see this

28   protective effect of vaccination.  (Tr. 226:18-23.)

1    Dr. Lewnard also testified that during the relevant period, the public health community

2  had clear evidence that vaccination reduced the severity of illness for people who became

3  infected.  (Tr. 227:14-25.)  He testified that a vaccinated person was understood to "have far

4  lower likelihood" of experiencing hospital admission or death when compared to an

5  unvaccinated person.  (*Id.*)

6    Addressing alternative measures, Dr. Lewnard testified that all were understood to

7  increase the risk posed by COVID-19:

8  • PCR testing every two days with a one-day results turnaround would reduce the risk

9    of transmission within a workplace or other setting by about 57 percent.  (Tr. 228:12-

10    229:6.)  (This was compared to the compounding benefits of vaccination – a

11    substantial decrease in the risk of infection, and then a reduced chance of

12    transmission in the event of infection, as addressed above.)  Such a PCR testing

13    regimen would not have been realistic under the conditions at the time.  (Tr. 229:13-

14    19.)  Rapid-antigen tests were not available; such tests had recently been authorized

15    for use by the Food and Drug Administration, but there was not yet sufficient supply.

16    (Tr. 231:11-19.)  Even had the tests been available, studies indicated that weekly

17    rapid-antigen testing would reduce the number of COVID cases by only about

18    24 percent.  (Tr. 231:20-232:7.)

19  • Masking was not understood to be an effective alternative to vaccination.  (Tr. 232:9-

20    17.)  At the relevant time, there were very few studies that assessed the effectiveness

21    of masks in reducing transmission of SARS-CoV-2.  (Tr. 232:18-233:6.)  Earlier

22    studies concerning influenza and other respiratory viruses did not show a strong

23    protective effect of masks.  (*Id.*)  In the time period October 2021 through early 2022,

24    the public health community did not have solid evidence that masks offered a

25    measurable reduction in risk of infection or risk of transmission, in contrast to the

26    available information for vaccination, which showed significant protective effects.

27    (Tr. 233:24-234:8.)

28  ///

1    • As of October 2021 through early 2022, the public health community understood that

2      social distancing – maintaining a distance, such as three or six feet, from other people

3      – was not an effective way of preventing SARS-CoV-2 transmission.  (Tr. 234:10-18.)

4      By that time, there was a relatively clear understanding that an infected person could

5      transmit the virus over a far longer distance.  (Tr. 234:19-235:12.)

6    • The public health community understood that wearing gloves would not do much,

7      if anything, to reduce a person's risk of acquiring or transmitting infection.

8      (Tr. 237:6-11.)  Likewise, frequent surface cleaning was understood not to do much to

9      prevent transmission.  (Tr. 238:4-8.)

10    Dr. Lewnard testified that natural immunity, meaning the protection acquired from a prior

11   infection, was understood not to provide protection equivalent to vaccination.  (Tr. 238:9-

12   239:11.)  Trials had begun to come out demonstrating that a person who was previously infected

13   and then vaccinated had an 82 to 85 percent reduction in risk of reinfection, compared to not

14   being vaccinated.  (*Id.*)  There were no studies that documented a decrease in risk of transmission

15   from a previous infection.  (Tr. 239:12-240:5.)  The evidence was clear that even someone

16   previously infected benefitted substantially from vaccination, both with respect to avoiding

17   reinfection and with respect to decreasing transmission if reinfected.  (*Id.*)

18    Dr. Lewnard summed up his testimony as follows:  "There were no available

19   interventions at this time which offered comparable benefit in comparison to vaccination."

20   (Tr. 240:6-12.)  Any other measure would have increased the health and safety risk.  (Tr. 240:13-

21   15.)  The vaccination of BART's employees made its stations, trains, and other workplaces safer

22   with respect to COVID-19.  (Tr. 279:6-8.)  The continued presence of unvaccinated employees at

23   BART's facilities would have made those locations less safe with respect to COVID-19.

24   (Tr. 279:9-13.)  Dr. Lewnard testified that the matters about which he testified were "widely

25   disseminated at the time" and within the mainstream of the public health community.  (Tr. 272:2-

26   8, 275:23-276:7.)

27    BART also presented expert testimony from Nancy McClellan, a board-certified

28   industrial hygienist.  McClellan testified concerning her training, experience, and credentials at

1   pages 287 through 293 of the transcript.  McClellan spent 60 hours on her work, which was to do

2   a risk assessment of BART's facilities and jobs to determine the best solutions to prevent SARS-

3   CoV-2 from transmitting person to person.  (Tr. 294:2-8; 303:15-17.)

4          McClellan testified that by the period October 2021 through early 2022, it was known to

5   industrial hygienists that SARS-CoV-2 was spreading quickly and easily, mostly through the air.

6   (Tr. 294:11-295:6.)  It was understood that many interventions that had been tried, like hand

7   washing, disinfecting surfaces, gloves, and putting up barriers, were not effective at slowing

8   transmission.  (*Id.*)  At the time, the industrial health community understood that vaccination was

9   the best solution to protecting someone from infection, as well as decreasing severity of illness

10  and transmission.  (Tr. 295:7-296:19.)  At every opportunity, federal OSHA encouraged

11  vaccination.  (Tr. 298:9-15.)

12         McClellan concluded that BART's workplaces presented medium and high risks of

13  COVID-19 exposure and transmission.  (Tr. 303:18-304:2.)  There were no effective controls

14  available to BART other than vaccination to protect those present in its workplaces.  (Tr. 310:7-

15  14.)  Testing raised concerns of false negatives and a lag in results reduced effectiveness.

16  (Tr. 310:23-311:14.)  Even a properly fitted N95 face mask was not understood to be an effective

17  alternative to vaccination.  (Tr. 312:21-313:5.)

18         McClellan summarized her opinions as follows:  BART had medium- to high-risk

19  environments.  (Tr. 313:21-314:6.)  Other available controls were not adequate, and employee

20  vaccination was a necessary control because of the risk level.  (*Id.*)  The continued presence of

21  unvaccinated workers, even using the available interventions, would have made BART's

22  workplaces less safe and increased the risk level for co-workers and the public.  (Tr. 314:7-12.)

23                  **c.**     **Plaintiffs Presented No Contrary Evidence Concerning the**
                          **Public Health Guidance, and Made a Strategic Decision to**
24                          **Present No Expert Scientific Evidence**

25         Plaintiffs presented no contrary evidence concerning the public health guidance available

26  to BART during the relevant period, October 2021 through February 2022, when their exemption

27  and accommodation requests were pending.  The evidence from BART's employee witnesses

28  concerning the information available to the agency, on which it relied, was uncontradicted, as

1    was the testimony of Dr. Lewnard and McClellan.

2           During discovery, Plaintiffs belatedly disclosed an expert to oppose Dr. Lewnard,

3    Dr. Harvey Risch, an emeritus professor of epidemiology at Yale University.  (*See* Doc. 58.)

4    Plaintiffs consumed valuable judicial resources defending their late designation, including

5    opposing a motion by BART to exclude his testimony.  (*See* Doc. 65.)  Plaintiffs' late disclosure

6    contributed to the original trial date being continued.

7           Despite the substantial time invested by the Court and the parties, Plaintiffs made a

8    strategic decision not to call Dr. Risch at this trial (Tr. 676)[1], even after including him on their

9    witness list (Doc. 95) and discussing with BART and the Court during trial that he would be their

10   last witness in Phase I (*see* Tr. 591:18-594:24).  This strategic decision, made by Plaintiffs,

11   meant that the expert testimony of Dr. Lewnard was unrebutted.  Plaintiffs designated no witness

12   to rebut McClellan.

13          Plaintiffs' only Phase I witnesses were themselves.  They presented no scientific

14   evidence, instead testifying about other COVID-19 interventions BART had used <u>before</u> the

15   vaccination requirement.  (*E.g.*, Tr. 562:6-563:8, 580:15-23, 630, 664-65, 670-71, 695.)

16   Plaintiffs presented no evidence to dispute or contradict BART's showing that, based on the

17   public health guidance available to BART at the time, permitting Plaintiffs to continue to work at

18   its facilities while unvaccinated was understood to increase the COVID-19 health and safety risk

19   for other employees and, in some instances, patrons.

20                 **3.    The Trial Evidence Established that Plaintiffs Could Not Perform**
                           **Their Essential Job Duties Remotely**
21

22          BART presented undisputed evidence that each Plaintiff could not perform their essential

23   job duties remotely:

24          Roddney Lee, BART's Assistant General Manager for External Affairs, testified that he

25   oversees BART's customer service clerks, the position held by Plaintiff Rosalind Parker.

26   (Tr. 451:22-24, 452:23-453:1.)  Customer service clerks, like Parker, were required to work

27   _____

28   [1] Volume 4 of the transcript (pp. 596-783) does not include line numbers, so BART cites
     only to the page numbers.

DEF'S MTN. FOR JMOL OR, IN THE ALTERNATIVE, FOR NEW TRIAL

1   in person throughout the pandemic.  (Tr. 453:16-454:9.)  The position's essential job duties

2   included assisting customers in person at a customer service office located at BART's

3   Lake Merritt station.  (Tr. 455:5-457:5.)  Between three and five BART employees worked in the

4   customer service office on an average day.  (Tr. 457:21-24.)  Because they worked in a BART

5   station, customer service clerks also had contact with other BART employees, such as station

6   agents, system service representatives, and maintenance personnel.  (Tr. 458:12-20.)  Customer

7   service clerks shared a breakroom and restroom with other BART employees.  (Tr. 458:21-25.)

8   Parker could not have avoided contact with other employees and performed the essential

9   functions of her job.  (Tr. 459:13-17.)

10      Michael Shane Edwards, BART's Assistant General Manager of Operations (Tr. 508:25-

11   509:1), testified concerning four plaintiffs:

12   • Plaintiff Bradford Mitchell was the Rolling Stock Component Maintenance

13      Superintendent, a position overseen by Edwards.  (Tr. 511:4-10, 512:2-7.)    This

14      position supervises the safety and operations in one of BART's train maintenance

15      shops; Mitchell worked at the Richmond shop.  (Tr. 512:8-12, 512:17-19.)  Other

16      BART employees working in the shop included transit vehicle mechanics, transit

17      vehicle electronic technicians, floor workers, and storekeepers.  (Tr. 513:14-22.)

18      During the relevant period, October 2021 through February 2022, a shift at the

19      Richmond shop could include 10 to 25 BART employees.  (Tr. 515:9-16.)  Mitchell

20      could not have done his job remotely.  (Tr. 515:25-516:6.)

21   • Plaintiff Raymond Lockett was an Operations Supervisor Liaison, a position overseen

22      by Edwards.  (Tr. 517:2-4.)  This position is responsible for overseeing, supervising,

23      and coordinating daily operations and activities on BART extension or renovation

24      construction projects.  (Tr. 517:24-9, Ex. 326.)  The position is required to be on site

25      whenever a contractor is on site.  (Tr. 519:14-16.)  At the relevant time, most of their

26      work was in the transbay tube.  (Tr. 519:17-21.)  There was no way for an Operations

27      Supervisor Liaison to perform their essential job functions and avoid contact with

28      others.  (Tr. 522:22-25.)

1        • Plaintiff Sze Cheng Sun was a Computer Electronic Technician, a position overseen

2          by Edwards. (Tr. 523:4-6.) This position's duties include installing, repairing, and

3          maintaining computer hardware and components. (Tr. 523:18-524:8; Ex. 391.) A

4          Computer Electronic Technician may be required to travel to the location of the

5          computer they are working on to perform their essential job duties. (Tr. 524:17-20.)

6          The position travels throughout BART's facilities. (Tr. 525:11-13.) There was no

7          way for a Computer Electronic Technician to avoid contact with others and perform

8          their essential job functions. (Tr. 526:12-15.)

9        • Plaintiff Tonya Lewis-Williams was a utility worker, a position overseen by Edwards.

10          (Tr. 526:17-19.) A utility worker performs janitorial duties on trains and in rolling

11          stock shops. (Tr. 526:20-527:21.) A utility worker working at the end of a line would

12          have potential contact with the public and other employees. (Tr. 527:22-528:1.) A

13          utility worker working in a shop would have contact with other employees. (Tr.

14          528:2-4.) A utility worker could not avoid contact with others and still perform the

15          essential functions of their job. (Tr. 528:9-16.)

16      Roland Kirk Fowlks, BART's Manager of Logistics, testified that he is the supervisor of

17  BART's storekeepers, the position held by Plaintiff Ryan Rivera. (Tr. 542:8-9, 542:17-543:1,

18  543:18-21.) A storekeeper is responsible for the receipt, storage, issue, distribution, and

19  counting of material. (Tr. 544:17-20; Ex. 381.) Storekeepers work in BART warehouses or

20  shop areas. (Tr. 546:22-24.) A storekeeper must physically work within the BART facility.

21  (Tr. 547:7-9, 549:20-550:3.) They may interact with delivery drivers and other BART

22  employees. (Tr. 547:19-25.) A storekeeper cannot work remotely. (Tr. 550:9-11.)

23      Plaintiffs <u>admitted</u> that they performed their essential job duties in person at BART

24  facilities:

25        • Rosalind Parker testified that she worked inside BART's Lake Merritt station, on the

26          concourse level, with four co-workers. (Tr. 560:21-561:4, 572:17-22.) Parker had to

27          travel through the station to reach her office, and to go to the bathroom. (Tr. 572:23-

28          573:3.) She never worked remotely. (Tr. 573:15-20.)

1     •   Tonya Lewis-Williams testified that she worked at BART's Berryessa station.

2        (Tr. 576:4-6.)  After she cleaned a train, new passengers would get on that train within

3        five or ten minutes, or even sooner.  (Tr. 583:23-584:1, 587:16-19, 589:6-9.)

4     •   Raymond Lockett testified that in 2021 he spent a great deal of time working in the

5        transbay tube, with a number of contractors.  (Tr. 640.)  At all times during the

6        pandemic, Lockett came to work in person to supervise contractors.  (*Id.*)  He had to

7        be physically present at his assigned work location.  (Tr. 641.)

8     •   Ryan Rivera testified that he worked mostly in a warehouse.  (Tr. 655-56.)  On an

9        average day, he would work with 10 to 20 other BART employees, mostly face-to-

10       face.  (Tr. 657.)  He also went to BART stations.  (Tr. 660-61.)

11    •   Sze Cheng Sun testified that he worked at a BART facility adjacent to the

12       Lake Merritt station and throughout BART.  (Tr. 668, 669, 672, 673, 675.)  He never

13       worked remotely.  (Tr. 672.)  He could not work from home due to cybersecurity

14       concerns.  (Tr. 673.)

15    •   Bradford Mitchell testified that his duties were to oversee the Richmond shop, where

16       he was physically located.  (Tr. 691, 708.)  Everyone overseen by Mitchell was

17       required to work in person during the pandemic.  (Tr. 709.)  Mitchell himself had to

18       be physically present in the shops.  (*Id.*)  He never worked remotely.  (Tr. 710.)

19       **4.**     **Plaintiffs Referenced Unpaid Leave Policies, but BART Submitted Undisputed Evidence that Any Leave for Refusal to Comply with the Vaccination Policy Would Have Been Indefinite**

20

21      Plaintiffs testified that BART offered unpaid leave for certain medical conditions and

22 other reasons not at issue in this trial.  (*E.g.*, Tr. 635-36, 647.)  In closing argument, Plaintiffs'

23 counsel suggested that unpaid leave should have been a potential accommodation.  (Tr. 748, 749,

24 750, 752, 753.)

25      The evidence established, however, that such leave would have been indefinite, meaning

26 of an uncertain duration.  Maplestone, BART's Manager of Leave Programs, testified that BART

27 could accommodate an employee for a short-term, defined leave (Tr. 496:14-497:3), but that the

28 vaccine mandate was a continuing employment requirement (Tr. 497:22-25, 498:1-6).  Because

1  the vaccine requirement was a continuing employment requirement and an employee's religious

2  objection was not a temporary condition, "there isn't any purpose in giving you a short-term

3  leave because you're never going to come back and do the essential functions of your job."

4  (Tr. 497:14-21.)  The fact that unpaid leave would have been indefinite under these

5  circumstances is self-evident, but was supported by undisputed evidence.

6      **B.    Plaintiffs' Counsel Intentionally and Repeatedly Violated a Critical
           In Limine Ruling**

7

8      Prior to trial, the Court issued a written in limine ruling that Plaintiffs could not introduce

9  evidence or argument concerning exemption and accommodation decisions for persons not in

10 suit.  (Doc. 185.)  On the last day of trial in Phase II, Plaintiffs' counsel violated this in limine

11 ruling three times, including twice during rebuttal closing argument.

12     During his Phase II testimony, BART's Manager of Leave Programs, Maplestone,

13 testified that he was aware that some BART employees did not want to be vaccinated for secular

14 reasons.  (Tr. 1014:12-15, 1015:23-1016:3.)  Maplestone did not state the number of secular

15 objectors, instead testifying that "a lot of employees didn't want to get vaccinated, and they were

16 vocal about that."  (Tr. 1015:23-1016:3.)  He testified that, given that secular vaccine hesitancy

17 existed in BART's workforce, it was important for BART to be fair to all employees, which

18 required assessing whether an exemption applicant had established a sincerely held religious

19 belief that conflicted with vaccination, as opposed to a secular belief.  (Tr. 1015:23-1016:3.)

20     At the beginning of cross-examination, Plaintiffs' counsel set about violating the Court's

21 in limine ruling.  Counsel first asked how many BART employees had requested religious

22 exemptions, and Maplestone answered that more than 200 had.  (Tr. 1042:10-15.)  Counsel then

23 asked the exact question barred by the in limine order:  "Well, how about with accommodations

24 and religious exemptions, how many did you grant?"  (Tr. 1042:18-19.)  The Court sustained

25 BART's objection.  (Tr. 1042:20-25.)  Plaintiffs' counsel did not request to approach the bench

26 to seek a ruling on whether the "door had been opened."  Instead, counsel deliberately violated

27 the order, knowing that a sustained objection would not un-ring the bell.

28 ///

1  Plaintiffs' counsel then doubled and tripled down during rebuttal closing argument. At
2  the beginning of rebuttal, counsel declared: "First of all, you know, there were 180 employees
3  that requested a religious exemption out of 4,200 employees at BART, right? And you didn't
4  hear any evidence of any of them being accommodated or having their –" (Tr. 1088:15-18.)
5  Counsel was stopped from proceeding further by BART's objection, which the Court sustained.
6  (Tr. 1088:19-1089:6.) The Court attempted to address Counsel's violation with the jury: "That
7  is ruled – I told the lawyers early on that we were not going to get into the issue of all – what
8  happened with all of the other people because that would have been 180 more trials for you to –
9  we'd have to go through all of them. I said we're not going to put the jury through what BART
10  did or did not do with respect to the 180, or whatever the number is, of the people who applied
11  for religious exemption. It will be hard enough for them to work with these six." (Tr. 1088:20-
12  1089:3.)

13  Despite the sustained objection, counsel continued in the same vein: "Well, you didn't
14  hear any evidence of anybody else getting exemptions, I don't believe. Maybe Mr. Maplestone
15  talked about that. I don't recall that. In any event, you know, they could have tried harder to
16  accommodate the small percentage. This is 4 percent of the workforce that expressed a religious,
17  you know, problem with the vaccine requirement." (Tr. 1089:7-13.) BART objected again, and
18  the Court sustained the objection and instructed the jury to disregard the improper argument.
19  (Tr. 1089:14-19.) The Court then made a further comment to the jury: "If we were going to do
20  that, we would have had – we would have had to have had a five-week trial in which we would
21  bring in all those people, and BART's position would be -- no, we do six people." (Tr. 1089:21-
22  24.) The unfair prejudice that the in limine ruling was issued to avoid and Plaintiffs' counsel
23  sought to inflict was now firmly imbedded in the jurors' minds.

24  **III.    Argument**

25  **A.    Standard for Judgment as a Matter of Law Under Rule 50(b)**

26  "Under Rule 50, a court should render judgment as a matter of law when 'a party has
27  been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable
28  jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

1  133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)).  "[T]he standard for granting summary judgment

2  'mirrors' the standard for judgment as a matter of law, such that the inquiry under each is the

3  same."  *Id.* at 150 (internal quotation omitted).  Judgment as a matter of law is appropriate "if the

4  evidence, construed in the light most favorable to the nonmoving party, permits only one

5  reasonable conclusion, and that conclusion is contrary to the jury's verdict."  *Escriba v. Foster*

6  *Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014).

7       The court must consider the entire evidentiary record.  *Escriba*, 743 F.3d at 1242.  "A

8  jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support

9  the jury's findings, even if contrary findings are also possible."  *Id.*  "'Substantial evidence' is

10  more than a scintilla of evidence; it means such relevant evidence as a reasonable mind might

11  accept as adequate to support a conclusion."  *Fisher v. City of San Jose*, 558 F.3d 1069, 1074

12  (9th Cir. 2009) (internal quotation omitted).  "[T]he court is not to make credibility

13  determinations or weigh the evidence and should view all inferences in the light most favorable

14  to the nonmoving party."  *Winarto v. Toshiba Am. Elec. Components, Inc.*, 274 F.3d 1276, 1283

15  (9th Cir. 2001); *Cf. Sip-Top, Inc. v. Ekco Grp., Inc.*, 86 F.3d 827, 820 (8th Cir. 1996) (a court

16  "may not accord a party the benefit of unreasonable inferences or those at war with undisputed

17  facts").  The court "must disregard all evidence favorable to the moving party that the jury is not

18  required to believe."  *Reeves*, 530 U.S. at 151.

19       **B.       Standard for a New Trial Under Rule 59**

20       A trial court may grant a new trial "for any reason for which a new trial has therefore

21  been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a).  Such grounds include a

22  verdict that is "contrary to the clear weight of the evidence, or is based upon evidence which is

23  false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice."  *Silver*

24  *Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).  "The judge

25  can weigh the evidence and assess the credibility of witnesses, and need not view the evidence

26  from the perspective most favorable to the prevailing party."  *Landes Const. Co., Inc. v. Royal*

27  *Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  "[T]he trial judge does not sit to approve

28  miscarriages of justice."  *Id.* (quoting Wright & Miller, Federal Practice and Procedure § 2806, at

1    48-49 (1973)). "If, having given full respect to the jury's findings, the judge on the entire

2    evidence is left with the definite and firm conviction that a mistake has been committed, it is

3    to be expected that he will grant a new trial." *Id.*

4    **C.    BART's Affirmative Defense**

5        **1.    BART Is Entitled to Judgment as a Matter of Law**

6            **a.    BART Established as a Matter of Law That Permitting a
                     Plaintiff to Continue Working in Person While Unvaccinated

7                    Would Have Imposed an Undue Burden**

8        Plaintiffs began their opening statement in Phase II of trial by telling the jury that they

9    "heard a good deal about health and science" during Phase I, but would now "be pivoting from

10   science to faith . . . leav[ing] science and statistics and look[ing] at faith and mathematics."

11   (Tr. 801:4-9.)  BART agrees that Phase I of the trial was about science; that is why BART is

12   entitled to judgment as a matter of law.

13       The analytical starting point is Jury Charge 20, which stated the law as follows:

14   "An undue burden is shown when a burden is substantial in the overall context of an employer's

15   business.  If a potential accommodation would threaten the health and safety of co-workers or

16   others, or increase a health and safety risk posed to co-workers or others, then that potential

17   accommodation imposes an undue hardship."  (Doc. 207.)  If BART established that permitting a

18   Plaintiff to continue to work while unvaccinated would increase the COVID-19 health and safety

19   risk for a co-worker or others, that accommodation imposed an undue burden as a matter of law.

20       BART provided undisputed testimony from Powers and Lau that it consulted and

21   followed public health guidance with respect to its COVID-19 response, and that such guidance

22   recommended vaccination as the safest COVID-19 countermeasure.  (Tr. 356:24-357:13, 384:5-

23   10, 387:2-8, 426:8-427:5.)  BART also provided undisputed testimony from Maplestone, the

24   employee who led the accommodation analysis, that (i) an accommodation could be approved

25   only if it provided the same level of safety as vaccination, (ii) BART consulted public health

26   guidance to make that assessment, (iii) the guidance advised that vaccination was the most

27   effective public health intervention to prevent the spread of COVID-19, so (iv) BART could

28   identify no acceptable accommodation other than an employee never working at a BART

1   facility.  (Tr. 469:19-470:4, 470:10-19, 470:20-24, 474:24-475:9, 484:23-485:3, 502:7-16.)

2      Plaintiffs did not submit <u>any evidence</u> that the public health guidance was otherwise.

3   Instead, Plaintiffs submitted only their own testimony concerning the safety measures <u>previously</u>

4   undertaken before the vaccination requirement, coupled with assertions that such measures had

5   been good enough and should have been continued as accommodations.  But that contention is

6   contrary to the controlling law as stated in Jury Charge 20.  While Plaintiffs may assert that prior

7   measures (*e.g.*, masking, social distancing) provided some protection against COVID-19, that is

8   not the relevant standard.  The undisputed public health guidance was that vaccination provided

9   <u>greater</u> safety against COVID-19, so an employer, like BART, was entitled to reject prior

10  measures as imposing an undue burden because they would increase the COVID-19 health and

11  safety risk for others.  That is especially so because BART made its accommodation decisions

12  during one of the most dangerous times in the pandemic.  (Tr. 217:25-218:8, 220:2-13, 220:14-

13  221:7.)  Under the law, BART was not required to compromise employee or patron health and

14  safety to accommodate a Plaintiff, particularly during one of the most dangerous periods of the

15  greatest public health crisis of the century.

16     BART's lay witness testimony met its burden of proof with respect to the evidentiary

17  showing required by Jury Charge 20.  As the Supreme Court has held, a trier of fact may not

18  arbitrarily disregard unrebutted evidence:  "We recognize the general rule, of course, as stated by

19  both courts below, that the question of the credibility of witnesses is one for the jury alone; but

20  this does not mean that the jury is at liberty, under the guise of passing upon the credibility of a

21  witness, to disregard his testimony, when from no reasonable point of view is it open to doubt."

22  *Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209, 216 (1931); *see also Selle v. Gibb*, 741

23  F.2d 896, 903 (7th Cir. 1984) ("the testimony of credible witnesses concerning a matter within

24  their knowledge cannot be rejected without some impeachment, contradiction or inconsistency

25  with other evidence on the particular point at issue"); *Chicago, Rock Island & Pac. Ry. Co. v.*

26  *Howell*, 401 F.2d 752, 754 (10th Cir. 1968) ("The fundamental rule which makes the jury the

27  sole judge of the weight and credibility of testimony is subject to the caveat that testimony

28  concerning a simple fact, capable of contradiction, not incredible, and standing uncontradicted,

1    unimpeached, or in no way discredited by cross-examination, must be permitted to stand."). 

2    The fact that the witnesses were BART employees is not a sufficient basis to disregard their 

3    uncontradicted testimony. *Chesapeake & Ohio Ry.*, 283 U.S. at 216.  BART's lay witness 

4    testimony concerning its reliance on the relevant public health guidance, unrebutted by Plaintiffs, 

5    entitled it to judgment as a matter of law under the law stated in Jury Charge 20.[2] *E.g.*, *Pease v.* 

6    *Production Workers Union of Chicago*, Case No. 02 C 6756, 2004 WL 526369, *4 (N.D. Ill. 

7    March 15, 2004) (granting judgment as a matter of law over jury verdict in Title VII case where 

8    defendant established defense by uncontroverted testimony); *Quinn v. Southwest Wood Prods.,* 

9    *Inc.*, 597 F.2d 1018, 1024 (5th Cir. 1979) (directing entry of judgment as a matter of law where 

10   jury verdict conflicted with uncontradicted and unimpeached testimony). 

11        BART also provided unrebutted expert witness testimony from Dr. Lewnard and 

12   McClellan.  The jury decides how much weight to give to expert opinion. *City of Pomona v* 

13   *SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).  But a jury may not reasonably 

14   disregard uncontroverted, unimpeached expert testimony simply because an expert was retained 

15   by a party and paid for their time. *Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 76-77 

16   (1st Cir. 2002) (vacating verdict and directing entry of judgment as a matter of law because jury 

17   could not reasonably disbelieve uncontroverted expert witness testimony that "was not 

18   improbable, inconsistent, or otherwise facially unbelievable"); *Security-First Nat. Bank of Los* 

19   *Angeles v. Lutz*, 322 F.2d 348, 355 (9th Cir. 1963) ("the trier may not act arbitrarily in 

20   disregarding uncontradicted and entirely probable testimony of [expert] witnesses whose 

21   qualifications and judgment have not been discredited").  "The general rule that a jury verdict 

22   cannot be based solely on the jury's rejection of the other side's uncontradicted testimony applies 

23   with particular force to expert testimony on matters outside of lay competence. While juries may 

24   decide what weight to give to the testimony of expert witnesses, they are not at liberty to 

25   disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert 

26   _____

27        [2]   That is especially true considering the time limitation that the Court imposed for witness
     examination.  That limitation required BART to present its case very efficiently, and BART did

28   so.

witness where the testimony bears on technical questions beyond the competence of law

determination." *Quintana-Ruiz,* 303 F.3d at 77-78 (internal quotation omitted); *see also In re*

*RFC and ResCap Liquidating Trust Action,* 399 F. Supp. 3d 804, 810-11, 818 (D. Minn. 2019)

(relying on *Quintana-Ruiz* to grant judgment as a matter of law where jury verdict conflicted

with uncontradicted and unimpeached expert testimony on technical matter); *NewSCI, Inc. v.*

*Staffing 360 Solutions, Inc.,* 865 F.3d 251, 157 (5th Cir. 2017) ("A jury may not disregard

arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness on a

technical question beyond the competence of lay determination." (internal quotation omitted)).

That rule applies to the testimony from Dr. Lewnard and McClellan here.[3]  *E.g., Imperium IP*

*Holdings (Cayman) Ltd. v. Samsung Elec. Co., Ltd.,* 757 Fed. Appx. 974, 979-80 (Fed. Cir.

2019) (reversing jury verdict and entering judgment as a matter of law where verdict was

contrary to uncontradicted, detailed expert witness testimony on technical issue).

   In addition, Dr. Lewnard offered primarily undisputed historical testimony, not opinion

testimony.  Dr. Lewnard testified about the state of public health knowledge concerning various

aspects of COVID-19 vaccination and other interventions during the relevant period, October

2021 through early 2022.  Dr. Lewnard did not offer his opinion with respect to scientific

questions or issues; rather, he testified concerning what the public health community thought it

knew about various matters at a particular point in time.  Dr. Lewnard had personal knowledge

of this historical background given his extensive involvement as an infectious disease

epidemiologist working on the pandemic.  (Tr. 212:22-24 (authored between 25 and 30 peer-

reviewed academic articles concerning COVID-19), 213:12-214:19 (describing

contemporaneous work on COVID-19).  Dr. Lewnard testified primarily as a historian, telling

the jury what the public health understanding was with respect to important COVID-19

_____

   [3]   The time limitation imposed for examination must again be considered.  Expert witness testimony can be exhaustive, with a witness showing the jury many sources relied upon.  To abide by the Court's time limitation, BART presented only limited examples of source materials, and did not delve into their details.  The time limitation imposed would not have permitted such examination.  Dr. Lewnard and McClellan testified definitively, addressing the essential matters, and there can be no proper contention that their explication should have been expanded because BART was unable to do so under the time limit set by the Court.

1    vaccination and safety matters.

2          As discussed, Plaintiffs designated an opposition expert to answer Dr. Lewnard.  But

3    Plaintiffs made a strategic decision not to call Dr. Risch.  The result of that decision is that

4    Dr. Lewnard's testimony, as well as that of Powers, Lau, and Maplestone, was unrebutted on the

5    critical dispositive question whether BART followed public health guidance in assessing that

6    permitting the Plaintiffs to continue to work while unvaccinated would increase a health and

7    safety risk for others.[4]

8          Phase I was about science.  The question was whether permitting a Plaintiff to continue

9    working at BART's facilities while unvaccinated would increase a COVID-19 health and safety

10   risk for others.  BART introduced evidence that it relied on public health guidance to conclude

11   that it would.  BART supported its lay witness testimony with experts who recounted the state of

12   the public health understanding during that period (Dr. Lewnard) and explained how that

13   guidance applied specifically to BART's workplaces (McClellan).  Plaintiffs offered no contrary

14   scientific evidence or public health guidance.  On this record, BART established as a matter of

15   law that it would have suffered an undue hardship were it required to permit any of the Plaintiffs

16   to continue to work at its facilities while unvaccinated.

17                    **b.    BART Established as a Matter of Law that Each Plaintiff
                             Could Not Perform Their Essential Job Duties Remotely**
18

19         During the pandemic, some were able to perform their jobs remotely, without visiting

20   their employer's facilities.  BART established as a matter of law, however, that the six Plaintiffs

21   here could not do so.

22         BART will not repeat the evidence set forth above.  The record establishes there was no

23   triable issue concerning whether any Plaintiff could work remotely, a fact the Plaintiffs

24   conceded.  Rather, all six had to work in person, at a BART facility, to perform their essential

25   _____

26         [4]   At the prior trial in July 2024, Plaintiffs called Dr. Risch.  That is why BART did not
      bring a Rule 50 motion at that time.  Dr. Risch's testimony, while severely lacking in credibility,
27    created an expert testimonial dispute to be resolved by the jury.  Here, due to Plaintiffs' tactical
      decision not to call Dr. Risch, there was no such expert dispute.  Plaintiffs failed to rebut
28    BART's affirmative defense.

1  job duties.  Accordingly, remote work would not have been an acceptable accommodation as a

2  matter of law.  *E.g.*, *Dark v. Curry County*, 451 F.3d 1078, 1088-89 (9th Cir, 2006).

3          **c.      BART Established as a Matter of Law that Unpaid Leave
                      Was Unavailable as a Potential Accommodation**
4

5          If an employee cannot work in person without imposing an undue burden, and cannot

6  perform essential duties while working remotely, then the only remaining accommodation would

7  be unpaid leave in lieu of termination.  Plaintiffs pivoted to unpaid leave as a potential

8  accommodation in the later stages of the Phase I trial.  But that contention is a legal dead end.

9          BART introduced unrebutted evidence that leave extended to permit an employee to

10  remain employed without being vaccinated would have been indefinite.  (Tr. 497:14-498:6.)  At

11  the relevant time, BART's employee vaccination requirement was a continuing condition of

12  employment.  (*Id.*)  BART did not know if, or when, the vaccinations requirement would be

13  repealed.[5]  "Job protected leave for a fixed period can be an accommodation, but <u>indefinite leave</u>

14  <u>is not reasonable as a matter of law</u>."  *Makor v. Burlington N. Santa Fe Ry. Co.*, 680 Fed. Appx.

15  542, 544 (9th Cir. 2017) (emphasis added) (applying California law under FEHA); *see also*

16  *LeBarron v. Interstate Group, LLC*, 529 F. Supp. 3d 1163, 1172 (D. Nev. 2021) ("[T]he ADA

17  does not require an indefinite, lengthy, unpaid leave of absence especially when the employer

18  does not know when the employee will be able to return to duty." (internal quotation omitted));

19  *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 676 (10th Cir. 2021) (same); *Wood v. Green*,

20  323 F.3d 1309, 1314 (11th Cir. 2003) (same); *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212

21  F.3d 638, 648 (1st Cir. 2000) (same).

22          Because the employee vaccination requirement was understood to be a continuing

23  condition of employment (*i.e.*, without a known end date), any leave extended to permit an

24  employee to maintain employment without being vaccinated would have been indefinite.

25  Such leave is not a reasonable accommodation as a matter of law.

26  _____

27          [5]  Evidence later in trial established that the employee vaccination requirement was not
    withdrawn until September 2023, about 18 months after Plaintiffs were terminated.
28  (Tr. 1041:20-21.)

1
2

**2.      Were BART Not Entitled to Judgment as a Matter of Law, the Court Should Grant a New Trial**

3      Were BART not entitled to judgment as a matter of law under Rule 50(b), the Court

4   should grant BART a new trial on its affirmative defense under Rule 59 because the Phase I

5   verdict is contrary to the clear weight of the evidence and results in a miscarriage of justice.

6   *Silver Sage Partners, Ltd.*, 251 F.3d at 819.

7      As discussed, BART established by overwhelming, uncontroverted evidence a point of

8   science and public health:  based on public health advice at the time, BART understood that

9   permitting unvaccinated employees to continue to work at its facilities would increase the

10   COVID-19 health and safety risk for other employees and the public.  For purposes of Rule 59,

11   the Court can weigh the evidence and assess witness credibility, and no other sound conclusion

12   can be reached.  As Plaintiffs themselves admitted, Phase I and the issue of BART's affirmative

13   defense was a question of science.  BART introduced unrebutted scientific evidence, including

14   through credible, unchallenged expert witnesses, to establish its defense.  Plaintiffs submitted <u>no</u>

15   <u>scientific evidence</u> in opposition.  As there was no compulsory lawful accommodation, a verdict

16   rejecting BART's affirmative defense is contrary to the clear weight of the evidence and a

17   miscarriage of justice.  BART was not required to compromise employee or patron health and

18   safety to accommodate a Plaintiff, and the Court must act to preserve this basic rule of law,

19   particularly given the politicized nature of the subject matter.

20
21

**D.      Repeated, Prejudicial Misconduct by Plaintiffs' Counsel Requires that the Court Order a New Trial**

22

**1.      Law Governing New Trial Based on Attorney Misconduct**

23      "A new trial is warranted on the grounds of attorney misconduct during the trial where

24   the flavor of misconduct sufficiently permeates an entire proceeding to provide conviction that

25   the jury was influenced by passion and prejudice in reaching its verdict."  *Anheuser-Busch, Inc.*

26   *v. Natural Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995) (internal quotation omitted).

27   Misconduct may "permeate" the trial even if it occurs only at the end of trial or in closing

28   argument.  *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1145 fn.16 (9th Cir. 2001).  A court

1    considers the "totality of circumstances, including the nature of the comments, their frequency,

2    their possible relevancy to the real issues before the jury, the manner in which the parties and the

3    court treated the comments, the strength of the case, and the verdict itself." *Hemmings v.*

4    *Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002).

5        **2.**    **The Court's In Limine Order**

6        The Court's in limine order excluded "evidence or argument pertaining to exemption and

7    accommodation requests and determinations not in suit." (Doc. 185 at 3.)  The order found that

8    such evidence or argument, even if presented in a limited manner, "presents a danger of unfair

9    prejudice and undue delay that substantially outweighs its probative value." (*Id.*)  Such evidence

10    risked confusing the issues, and unfairly prejudicing BART. (*Id.* at 6.)  As the Court explained,

11    "Plaintiffs have made clear that they expect this evidence to support the inference that BART did

12    not give genuine consideration to any of the exemption or accommodation decisions at issue.

13    BART cannot combat that inference absent significant delay and waste of trial time." (*Id.* at 7.)

14    As the Court noted, if the jury were told about exemption or accommodation decisions for

15    persons not in suit, BART's rebuttal would "require a march through each of those decisions"

16    and BART could not fairly "be asked to simply live with the inference that they rejected every

17    applicant out of hand, absent an opportunity to present that countervailing evidence." (*Id.*)

18    The Court concluded that such evidence or argument posed "danger of confusing the issues,

19    prejudicing BART, and causing delay and waste of time." (*Id.* at 9.)

20        **3.**    **Plaintiffs' Counsel Intentionally and Repeatedly Violated the**
    **In Limine Order, Even After the Court Ruled BART Had Not**
21        **"Opened the Door"**

22        As discussed above, Plaintiff's counsel repeatedly and intentionally violated the Court's

23    order.  During the Phase II testimony of Maplestone, Plaintiff's counsel directly asked the

24    forbidden question:  "Well, how about with accommodations and religious exemptions, how

25    many did you grant?" (Tr. 1042:18-19.)  This was after counsel elicited testimony from

26    Maplestone that there had been more than 200 exemption applications. (Tr. 1042:10-15.)

27    Counsel's improper question thus suggested to the jury that few or none of those applicants had

28    been exempted or accommodated.  The Court sustained BART's objection, but gave no curative

1    or limiting instruction.  (Tr. 1042:20-23.)  If Plaintiffs' counsel thought BART's counsel or

2    Maplestone had opened the door under the in limine order, counsel should have sought a ruling

3    from the Court before violating the order.  Counsel did not.

4        If the misconduct by Plaintiffs' counsel had ended there, BART likely would not have

5    sought any further relief.  But it did not.  Plaintiffs' counsel continued their misconduct at the

6    worst possible time, rebuttal closing argument.  As discussed above, Plaintiffs' counsel argued,

7    "First of all, you know, there were 180 employees that requested a religious exemption out of

8    4,200 employees at BART; right?  And you didn't hear any evidence of any of them being

9    accommodated or having their – "  (Tr. 1088:15-18.)  Counsel stopped only because BART

10   objected.  After the Court sustained the objection and told counsel she had made "improper

11   argument," counsel started right back up:  "Well, you didn't hear any evidence of anybody else

12   getting exemptions.  I don't believe.  Maybe Mr. Maplestone talked about that.  I don't recall

13   that.  In any event, you know, they could have tried harder to accommodate the small percentage.

14    This is 4 percent of the workforce that expressed a religious, you know, problem with the

15   vaccine requirement."  (Tr. 1089:7-13.)  Again BART objected, and again the Court sustained its

16   objection.  (Tr. 1089:14-19.)  There can be no doubt that counsel's repeated misconduct was

17   intentional and intended to inflame the jury.  The Court's ruling during the Maplestone cross-

18   examination that BART had not "opened the door" was made that same morning.

19            **4.    The Court Could Not Un-Ring the Bell, and Its Comments to the**
                  **Jury Inadvertently Increased the Prejudice to BART**
20

21        Counsel's deliberate misconduct during rebuttal closing argument put the Court in a

22   difficult position.  The Court attempted to address the rampant prejudice through comments to

23   the jury.  After counsel's first violation in rebuttal closing argument, the Court told the jury:

24   "I told the lawyers early on we were not going to get into the issue of all – what happened with

25   all of the other people because that would have been 180 more trials for you to – you'd have to

26   go through all of them.  I said we're not going to put the jury through what BART did or did not

27   do with respect to the 180, or whatever the number is, of the people who applied for religious

28   exemption.  It will be hard enough for them to work with these six."  (Tr. 1088:20-1089:3.)

1    Unfortunately, the Court's comments, including the reference to "180 more trials for you,"

2    reinforced counsel's wrongful assertion that there were 180 aggrieved employees.

3          After counsel's second violation in rebuttal closing argument, the Court told the jury:

4    "If we were going to do that, we would have had – we would have had a five-week trial in which

5    we would bring in all those people, and BART's position would be – no, we do six people."

6    (Tr. 1089:21-24.)  These comments, while intended to defuse the prejudice imposed by counsel's

7    misconduct, suggested to the jury that the question of BART's alleged wrongdoing was not

8    limited to the six plaintiffs, but extended to almost 200 employees and would have required

9    five weeks to address.

10                    **5.      BART Is Entitled to a New Trial**

11          This was a coordinated, planned attempt by Plaintiffs' counsel to violate the most

12    contested in limine order issued by the Court, at the end of the trial, when BART had been fully

13    heard and had no further opportunity to present additional evidence or even argument to the jury.

14    The Court's in limine order recognized the severely prejudicial nature of this argument, built on

15    Plaintiffs' inference that BART was a bad actor because it aggrieved not six, but 180 employees.

16    The violation was intended to inflame the jury and encourage a verdict infected with passion and

17    prejudice – indeed, there was no other reason for it.

18          All the factors identified by the Ninth Circuit support a new trial:

19          First, the nature of the comments was deeply prejudicial to BART for the reasons set

20    forth here and in the Court's in limine order.

21          Second, the violation was frequent, occurring three times on the last day of trial.

22          Third, the misconduct was relevant to real issues before the jury because it unfairly and

23    prejudicially suggested that BART's exemption and accommodation process had been a "sham,"

24    an argument that Plaintiffs made a theme of their trial presentation.

25          Fourth, BART handled the misconduct properly, timely objecting in each instance.

26    Indeed, the Ninth Circuit recognizes that objecting during closing argument can be prejudicial to

27    the party compelled to make the objection (because it can suggest to the jury that the objecting

28    party wants to hide or shield something from them).  *E.g.*, *Cunningham v. Wong*, 704 F.3d 1143,

1159 (9th Cir. 2013).  Just having to object was prejudicial to BART, and it had to do so twice during closing argument, as well as during cross-examination.  Plaintiffs of course, did not handle the misconduct appropriately, and repeated it, and then repeated it again.  And the Court's efforts to address the potential prejudice were not successful.

Fifth, this is not an instance where Plaintiffs have an overwhelming case.  As discussed here, BART is entitled to judgment as a matter of law on its affirmative defense.  Even were that not so, a different jury deadlocked 7-1 in BART's favor on that defense just months ago.

Sixth, the verdict itself indicates the influence of passion and prejudice.  The compensatory damages awarded to the Plaintiffs ranged from about twice to as much as four times the top end of their claimed economic damages.

The Court should order retrial of the entirety of the dispute, including BART's affirmative defense.  Though counsel's misconduct arose during Phase II, BART would be unfairly prejudiced by a retrial in which it was not permitted to introduce evidence concerning the process and analysis behind its accommodation decisions, because that process and its results speak to Plaintiffs' compensable damages.  A retrial that excluded accommodation would require a jury to assess damages after hearing only part of the story, to BART's substantial prejudice.  Given the audaciously inappropriate misconduct by Plaintiffs' counsel, retrial in full is necessary and appropriate.

**IV.    Conclusion**

For the reasons set forth herein, the Court should enter judgment as a matter of law pursuant to Rule 50(b).  If such a judgment is not entered, the Court should order a new trial under Rule 59.

Dated:  November 4, 2024

GLYNN, FINLEY, MORTL,
HANLON & FRIEDENBERG, LLP
JAMES M. HANLON, JR.
VICTORIA R. NUETZEL
DAWSON P. HONEY


By: /s/ *James M. Hanlon, Jr.*
Attorneys for Defendant San Francisco
Bay Area Rapid Transit District