GLYNN, FINLEY, MORTL,
HANLON & FRIEDENBERG LLP
JAMES M. HANLON, JR., Bar No. 214096
VICTORIA R. NUETZEL, Bar No. 115124
DAWSON P. HONEY, Bar No. 347217
One Walnut Creek Center
100 Pringle Avenue, Suite 500
Walnut Creek, CA 94596
Telephone: (925) 210-2800
Facsimile: (925) 945-1975
jhanlon@glynnfinley.com
vnuetzel@glynnfinley.com
dhoney@glynnfinley.com

SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT
OFFICE OF THE GENERAL COUNSEL
SAM N. DAWOOD, Bar No. 178862
2150 Webster St., 10th Floor
Oakland, CA 94612
Telephone: (510) 464-6023
Facsimile: (510) 464-6049
sdawood@bart.gov

Attorneys for Defendant
San Francisco Bay Area Rapid Transit District

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONYA LEWIS-WILLIAMS, RAYMOND LOCKETT, BRADFORD MITCHELL, ROSALIND PARKER, RYAN RIVERA, SZU CHENG SUN,<br><br>Plaintiffs,<br><br>vs.<br><br>SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT,<br><br>Defendant. | Case No. 3:22-cv-06119-WHA<br><br>Consolidated Cases:<br>Case No. 3:22-cv-09193-WHA<br>Case No. 3:22-cv-07720-WHA<br><br>**REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW (FRCP 50) OR, IN THE ALTERNATIVE, FOR A NEW TRIAL (FRCP 59)**<br><br>Hearing date: December 11, 2024<br>Hearing time: 8:00 a.m. |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT .........................................................................................................................3

    A. The Verdict Does Not Affect the Court's Rule 50 Analysis ...................................3

    B. There Was No Triable Issue Concerning BART's Affirmative Defense ...............3

        1. There Was No Triable Issue Concerning BART's Reliance on Public Health Guidance to Determine that Permitting a Plaintiff to Continue to Work in Person at its Facilities While Unvaccinated Would Impose an Increased Health and Safety Risk for Others ......................3

            a. Lay Witness Testimony ........................................................................3

            b. Expert Witness Testimony ...................................................................8

        2. There Was No Triable Issue Concerning Whether any Plaintiff Could Work Remotely ..................................................................................11

        3. Plaintiffs Do Not Dispute that Any Leave of Absence Would Have Been Indefinite ..........................................................................................12

        4. Plaintiffs' Efforts to Distinguish Away BART's Authorities and Suggest that Employment Discrimination Lawsuits Invariably Present Triable Issues of Witness Credibility Are Unavailing ....................................12

    C. Were BART Not Entitled to Judgment as a Matter of Law, It Would Be Entitled to a New Trial Under Rule 59 ............................................................13

III. CONCLUSION ....................................................................................................................15

**TABLE OF AUTHORITIES**

CASES

*Anheuser-Busch, Inc. v. National Beverage Distributors*
    69 F.3d 337 (9th Cir. 1995) .................................................................................................. 15

*Chesapeake & Ohio Railway Co. v. Martin*
    283 U.S. 209 (1931) ............................................................................................................ 9, 13

*Davis v. Team Electric Co.*
    520 F.3d 1080 (9th Cir. 2008) .................................................................................................. 12

*Imperium IP Holdings (Cayman) Ltd. v. Samsung Electronics Co., Ltd.*
    757 Fed. Appx. 974 (Fed. Cir. 2019) ............................................................................... 10, 13

*In re RFC and ResCap Liquidating Trust Action*
    399 F. Supp. 3d 804 (D. Minn. 2019) ...................................................................................... 13

*NewSCI, Inc. v. Staffing 340 Solutions, Inc.*
    865 F.3d 251 (5th Cir. 2017) .................................................................................................. 11

*Pease v. Production Workers Union of Chicago*
    Case No. 02 C 6756, 2004 WL 526369 (N.D. Ill. March 15, 2004) ....................................... 13

*Quinn v. Southwest Wood Products, Inc.*
    597 F.2d 1018 (5th Cir. 1979) ................................................................................................ 13

*Quintana-Ruiz v. Hyundai Motor Corp.*
    303 F.3d 62 (1st Cir. 2002) ......................................................................................... 9, 10, 11

*Reeves v. Sanderson Plumbing Products, Inc.*
    530 U.S. 133 (2000) .................................................................................................................. 3

*Security-First National Bank of Los Angeles v. Lutz*
    322 F.2d 348 (9th Cir. 1963) .................................................................................................. 11

*Selle v. Gibb*
    741 F.2d 896 (7th Cir. 1984) .................................................................................................. 13

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*
    251 F.3d 814 (9th Cir. 2001) .................................................................................................. 13

*Stratienko v. Cordis Corp.*
    429 F.3d 592 (6th Cir. 2005) .................................................................................................... 9

**TABLE OF AUTHORITIES**
Continued

RULES

Federal Rule of Civil Procedure
    Rule 50 .................................................................................................................. 2, 3
    Rule 50(a) ................................................................................................................... 3
    Rule 50(b) .............................................................................................................. 3, 15
    Rule 56 ........................................................................................................................ 3
    Rule 59 ......................................................................................................... 2, 13, 15

## I. Introduction

This case concerns two important public interests. First, an employer's right, indeed obligation, to take action to protect the health and safety of its employees and patrons against an historic public health threat. Second, an employee's right to maintain employment while exercising their sincerely held religious beliefs. When these interests conflict, as they did for Defendant San Francisco Bay Area Rapid Transit District ("BART") during the COVID-19 pandemic, courts must apply the law to strike a difficult, but necessary, balance.

The Court has properly recognized that Title VII and FEHA do not require an employer to accommodate an employee's religious observance if doing so would increase a health and safety risk for another employee or a patron. Such increased risk imposes an undue burden as a matter of law. An employee's right to exercise their religion at work must give way when doing so poses a health or safety risk for others. That is especially so when the employer is a public transit agency that had to remain open for essential workers and others who needed it during the pandemic. BART's workers were themselves essential workers, and BART had to do what it could to protect them from COVID-19 while at work.

An employer bears the burden to prove undue hardship, and BART met its burden at trial as a matter of law. Confronted with the greatest public health crisis in decades, BART looked to guidance from public health authorities – the Centers for Disease Control and the California Department of Public Health. BART also considered guidance from federal OSHA, the leading resource on occupational health and safety. As COVID-19 vaccines became available, that guidance was unanimous: vaccination was safer than any other available intervention because it was more effective at diminishing the spread of SARS-CoV-2. If a worker had to share a facility with others, then permitting that employee to continue to work while unvaccinated increased a health and safety risk for other people.

Plaintiffs do not argue that the public health guidance was otherwise. There is no evidence of contrary guidance from October 2021 through February 2022, when BART considered the Plaintiffs' requests for religious exemption and accommodation. Unable to contest the core, dispositive issue, Plaintiffs instead raise peripheral or irrelevant matter.

For example, Plaintiffs argue that the jury could properly ignore the expert testimony of Dr. Joseph Lewnard, an infectious disease epidemiologist, and Nancy McClellan, an eminent industrial hygienist, because BART did not consult them when making its accommodation decisions. But it is not and cannot be the law that an employer, confronted with a global health emergency, must engage an epidemiologist or industrial hygienist before it can act to protect the health and safety of its employees and patrons. In such circumstances, an employer must be permitted to rely on public health guidance, as BART did.

Plaintiffs also point the Court to caselaw from other employment contexts, such as gender or racial discrimination, and suggest that employment discrimination suits invariably present disputed issues of fact based on witness credibility. That is correct for cases concerning explicit or implicit bias, and its effects on hiring, promotion, and working conditions. But this case is an exception. There was no evidence of anti-religious animus at BART. To the contrary, the evidence is that these six religious plaintiffs worked happily at BART for decades. Rather, the gravamen of Plaintiffs' claims is that BART acted too strongly to protect health and safety during the pandemic, at the expense of their religious objection to vaccination. The key question is one of science, not bias. As noted in BART's opening brief, Plaintiffs themselves said as much to the jury. (*See* Tr. 801:4-9.) BART is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 50. Were that not so, BART would be entitled to a new trial under Federal Rule of Civil Procedure 59.

Plaintiffs also fail to take responsibility for, and wrongly seek to minimize, the egregious misconduct by their counsel during rebuttal closing argument. Plaintiffs suggest there is no indication that counsel's violation of the Court's in limine order inflamed the jury. But the damages awarded are ample evidence of prejudice. Each Plaintiff obtained an award more than 175% of the economic damages presented, with some higher still. Given the egregiousness of the attorney misconduct, its timing during rebuttal closing argument, and the scale of the verdict relative to the Plaintiffs' claimed economic damages, BART is entitled to a new trial, were it not entitled to judgment as a matter of law.

///

## II. Argument

### A. The Verdict Does Not Affect the Court's Rule 50 Analysis

As an initial matter, Plaintiffs wrongly present their opposition as though this motion must overcome the jury's verdict. When the parties rested in Phase I, the Court deemed Rule 50(a) motions made and submitted. (Tr. 715.) When a Rule 50(a) motion is made but not granted, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." (Fed. R. Civ. Proc. 50(b).) The legal analysis is thus unaffected by the jury's verdict. That is why the Supreme Court has held that a Rule 50 analysis stands on all fours with summary judgment. (*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135 (2000) ("The standard for judgment as a matter of law under Rule 50 mirrors the standard for summary judgment under Rule 56.").  BART's arguments stand in the same posture as though the Court took them up when the parties rested, or as though the same evidence were before the Court on summary judgment.[1] With respect to the verdict, the Court's Rule 50 analysis is *ex ante*, not *ex post*. The verdict is not a thumb on the scale, and BART should not be prejudiced because its motion was taken under submission, rather than argued and decided before the verdict issued.

### B. There Was No Triable Issue Concerning BART's Affirmative Defense

#### 1. There Was No Triable Issue Concerning BART's Reliance on Public Health Guidance to Determine that Permitting a Plaintiff to Continue to Work in Person at its Facilities While Unvaccinated Would Impose an Increased Health and Safety Risk for Others

##### a. Lay Witness Testimony

BART's motion cited unrebutted record evidence that it consulted and relied on public health guidance to determine that other available interventions (*e.g.*, masking, social distancing)

---

[1] BART did not move for summary judgment on undue burden because it anticipated that Plaintiffs would submit one or more opposition expert declarations, which, while ultimately not credible, could lead to triable issues. As noted in BART's opening brief, Plaintiffs eventually designated such an expert, Dr. Harvey Risch, but then made a strategic decision not to call him at trial (likely influenced by BART's cross-examination of Dr. Risch at the first trial in July 2024). Plaintiffs' strategic choice not to submit opposing expert testimony fundamentally changed the evidentiary landscape of the case by eliminating a "battle of the experts."

were not as protective as vaccination and, thus, would have imposed an increased health and safety risk for others. (Doc. 231 at 8-10.) In opposition, Plaintiffs do not cite any evidence of contrary public health guidance, and do not cite any evidence that BART failed to consult public health guidance before making its accommodation decisions. Unable to address the key legal issue, Plaintiffs instead raise peripheral or irrelevant matter.

Plaintiffs argue that evidence showed BART "did not, in fact, follow the public health guidance consistently." (Doc. 238 at 8.) Plaintiffs point to just three examples:

- First, Plaintiffs contend that public health agencies did not "require [BART] to deny any accommodations or fire any of their employees. (*Id.*) This is empty attorney argument and does not address the dispositive issue of increased health and safety risk. Public health agencies do not recommend or compel employer accommodation or termination decisions, and there is no evidence that any of these agencies addressed such matters. Rather, the public health agencies issue guidance that employers consult, as BART did.
- Second, Plaintiffs observe that BART did not require employees to receive vaccination boosters. (*Id.*) It is ironic that Plaintiffs protesting a vaccination mandate criticize their former employer for not also requiring vaccination boosters – this demonstrates the too common peril for employers, facing contentions they are wrong no matter how they proceed. It is also irrelevant. An employer's decision that an employment requirement is necessary for health and safety is not undermined because the employer did not take additional steps to provide even greater protection. Such a contention would place employers in an untenable position and has no support under controlling law.
- Third, Plaintiffs complain that BART did not consult other transit agencies concerning how they proceeded with accommodation decisions. (Doc. 238 at 8.) The Court issued an in limine ruling that decisions by other agencies were excluded from evidence because they had little probative value. (Doc. 115 at 4.) That ruling was correct, and remains so. BART was entitled to follow public

health guidance in making accommodation decisions, even if other employers chose not to do so, or determined that it applied differently to their circumstances.

Plaintiffs also argue there was a triable issue concerning undue burden because "BART doubles down on its insistence that the protocols it mandated throughout the pandemic – masks, social distancing, testing, and surface cleaning among them, were ineffective." (Doc. 238 at 8.) This is a straw man argument. BART did not contend that prior interventions were wholly ineffective. Rather, BART's position was based on the public health guidance: prior interventions were not sufficiently effective at preventing transmission of SARS-CoV-2 and should be <u>supplemented</u> by vaccination for <u>increased safety</u>. (*E.g.*, Tr. 469:19-470:4, 470:10-24, 474:24-475:9, 484:23-485:3, 502:7-16.) That position comports with the governing law on undue hardship. If Plaintiffs mean to suggest that prior interventions were sufficiently protective, and that vaccination provided no meaningful benefit, there is no such evidence in the record, and the point is rebutted by testimony of BART's lay witnesses and its scientific experts.

Plaintiffs point to testimony from Michael Shane Edwards, BART's Assistant General Manager of Operations, as supposedly admitting that prior interventions were sufficient to protect BART's workers and patrons. (Doc. 238 at 9.) The relevant portion of Edwards's cross-examination testimony is as follows:

> Q: All right. Did you – during this time period – well, during the COVID period, roughly beginning of 2020 through parts of 2022, were there ways that you felt you were able to keep the employees under your charge safe?
>
> A: Yes.
>
> Q: And what did you utilize? What did you do?
>
> A: We implemented a mask mandate before a mask mandate. We required it for all of our contractors, for example. We added it to contracts if it was a result of a change order, then we would execute that. Things of that nature.
>
> We also evaluated everyone's responsibilities and expectations at BART. If it was a service-related item, operations for example, almost everybody that works for me, then those roles were – were not afforded a remote work, for example, which only means that they could get two of five days to work from home, things of that nature.
>
> We focused on cleanliness. We added things all over the office, all over the shops for better cleanliness. We afforded people wipes, hand sanitizer, things of that nature as well.

> And then we also did some shifting of shifts, for example, so that we did not have a line of employees running into another line of employees, so to speak, during a shift change. So we staggered shifts up to 30, 40 minutes, just to try to avoid any unnecessary contact.
>
> Q: So safe to say you did a number of things to try to keep employees and the public safe; is that correct?
>
> A: Yes, sir.
>
> Q: Okay. Would those continue to be effective during the COVID-19 vaccine period, that time period?
>
> A: Yes.

(Tr. 531:1-532:5.) Edwards's testimony must be considered in its entirety and in context. Plaintiffs' counsel's own question provides that context: "So safe to say you did a number of things <u>to try to keep employees and the public safe</u>; is that correct?" (*Id.* (emphasis added).) Edwards did not testify that vaccination provided no additional health and safety benefit; rather, he testified about what BART did to "to try to keep employees and the public safe" before vaccination was available. His testimony is consistent with that of Alaric Degrafinried, BART's former Assistant General Manager for Administration, also cited by Plaintiffs:

> Q: And during the pandemic, do you believe that BART kept passengers safe from COVID while riding the trains?
>
> A: I think we tried, yes.

(Tr. 689.) No BART witness testified that prior interventions eliminated the COVID-19 health and safety risk such that vaccination, universally recommended by public health authorities, was not necessary to protect people at BART's facilities. Such testimony would have been counterfactual, even ridiculous, and the record cannot be fairly read in such a manner. Indeed, the record contains uncontroverted evidence that BART lost about <u>550,000 employee hours</u> to COVID-19 related illness in 2021. (Tr. 416:5-8, 430:22-24) The record also contains uncontroverted evidence that one of the most serious periods of the pandemic was the early months of 2022, as BART made the accommodation decisions at issue and just thereafter. (*See* Doc. 231 at 8.) COVID-19 seriously affected BART's employees, notwithstanding the health and safety measures in place prior to the employee vaccination requirement.

Plaintiffs also point to evidence that "only" three BART employees died of COVID-19 and "only" another five were hospitalized with serious COVID-19 illness as evidence that there was no COVID-19 risk, and vaccination was unnecessary. (Doc. 238 at 9-10.) Suffice to say, such argument finds no home in the law. The evidence showed that the most dangerous time of the pandemic was ahead, not behind, when the accommodation decisions were made. (Tr. 217:25-218:8, 220:2-13, 220:14-221:7, 222:21-223:21.) As noted, the record also establishes that BART lost about 550,000 employee hours to COVID-19 related illness in 2021, which is about <u>130 hours per employee</u>. (Tr. 414:13-18, 416:5-8, 430:22-24) Hence, the uncontroverted evidence establishes that COVID-19 caused extensive illness and absenteeism, in addition to death and hospitalization for very serious illness. Also, Plaintiffs' argument proves too much: BART's relative success in protecting its employees from death and hospitalization over the course of the pandemic was a <u>result</u> of the employee vaccine mandate and its implementation, including the accommodation decisions at issue. The law does not require an employer facing a deadly global pandemic to decide that a few more employee deaths and hospitalizations, or losing more than half a million employee hours, are acceptable costs to permit religious exercise at work.

Plaintiffs also quibble with various peripheral or irrelevant aspects of the testimony, such as partitions in customer service areas.[2] There was no evidence that the public health guidance recommending vaccination was undermined by such partitions; to the contrary, BART introduced unrebutted scientific testimony that public health authorities knew SARS-CoV-2 could circulate and infect people in different rooms in the same facility. (Tr. 234:10-235:12.)

Plaintiffs also point to complaints about the form of the letters that BART used to inform them of exemption or accommodation decisions. (Doc. 238 at 11.) The form of such letters has no bearing on whether the accommodation decisions at issue were lawful.

///

---

[2] Plaintiffs suggest that BART witness Roddney Lee was impeached on the subject of partitions by Plaintiff Rosalind Parker's later testimony. Not so. When Lee was asked whether he was "aware whether those customer service clerks had partitions between the windows that they serviced," he responded "No." (Tr. 461:11-14.)

Plaintiffs' meritless, evidence-less position is illustrated by their assertion that because Rodney Maplestone, the BART employee who led the accommodation decisions, "did not actually visit any of the Plaintiffs' worksites before determining no accommodation was possible, the jury could reasonably conclude BART had not met its burden of proving undue hardship by a preponderance of the evidence." (Doc. 238 at 12.) Faced with public health guidance that in-person work was less safe with unvaccinated workers present, there was no reason for BART to visit its worksites. This argument, like much of Plaintiffs' Phase I trial presentation, was irrelevant distraction and argument, seeking to disguise their lack of public health or other scientific evidence.[3]

### b. Expert Witness Testimony

Having failed to present expert testimony in a trial focused on public health and science, Plaintiffs raise a series of arguments why BART's experts may be disregarded: (1) they were not consulted during the relevant time period; (2) they did not visit BART's workplaces; (3) Dr. Lewnard has received research funding from vaccine manufacturers; and (4) McClellan testified, according to Plaintiffs, that "where people ae present, COVID-19 is present." (Doc. 238 at 8.) None of these arguments has merit.

First, Plaintiffs argue that because Dr. Lewnard and McClellan were not consulted during the pandemic, they "were not able to testify as to whether BART officials were actually aware of or relied upon the specific studies and guidance the experts put forward." (*Id.*) BART did not rely on either expert to testify concerning the public health guidance it consulted – BART's lay witnesses did that. The purpose of the expert testimony was to buttress BART's lay testimony by explaining what the public health understanding was at the time. Confronted with a public health crisis, an employer can rely on guidance from public health agencies without interrogating the technical bases for such guidance or reviewing on its own the underlying academic and research publications.

---

[3] Plaintiffs are so desperate for "evidence" to support their position on undue hardship that they cite trial testimony from Phase II, which concerned different matters and cannot be considered for this purpose. (*E.g.*, Doc. 238 at 12 (citing Lockett, Mitchell, and Parker Phase II testimony).)

Second, there was no sound reason for Dr. Lewnard or McClellan to visit BART's worksites, and there is no contrary indication in the record. Dr. Lewnard testified concerning the public health understanding of (i) the pandemic conditions at the relevant time, (ii) efficacy of the vaccines, and (iii) relative efficacy of the previously available interventions, like masking and social distancing. There was no need for Dr. Lewnard to visit any BART facility to provide such testimony, which was not site specific. McClellan's work was specific to BART's worksites, but she provided unrebutted testimony that she received all the technical information she required from subject matter experts at BART. (Tr. 302:15-303:14, 337:12-16.) As with Dr. Lewnard, there was no basis to disregard McClellan's testimony simply because she refrained from an unnecessary tour of BART's facilities.

Third, the fact that Dr. Lewnard has been an investigator or co-investigator for research projects funded by grants from pharmaceutical companies, including Pfizer, provides no basis for disregarding his testimony. First, as noted in BART's opening brief, Dr. Lewnard simply reported what was known and understood in the public health community at relevant times. He did not offer any novel scientific analyses or opinions, and his testimony was more in the nature of a historian.[4] Given the historical nature of Dr. Lewnard's testimony, Plaintiffs should have been able to introduce evidence of any inaccuracy, particularly because they engaged an opposing expert epidemiologist. Second, the Supreme Court has long held that the mere fact that a witness is employed by a party is not sufficient to impeach or discredit that witness's testimony. *Chesapeake & Ohio Ry Co. v. Martin*, 283 U.S. 209, 26 (1931); *see also Stratienko v. Cordis Corp.*, 429 F.3d 592, 598 (6th Cir. 2005) (affirming summary judgment entered based on declarations submitted by party's employees). The rule also applies to expert witnesses. The finder of fact cannot reasonably disregard uncontroverted, unimpeached expert testimony because the expert was compensated for their work. *Quintana-Ruiz v. Hyundai Motor Corp.*,

---

[4] Plaintiffs' assertion that BART somehow waived its ability to describe Dr. Lewnard's testimony as historical in nature is absurd and unsupported by any citation to the record or authority. Expert witnesses sometimes testify concerning historical conditions, including the state of knowledge. This is a proper subject of expert testimony, so there is nothing inconsistent with BART's description of Dr. Lewnard's testimony and his designation as an expert witness.

303 F.3d 62, 76-77 (1st Cir. 2002). *Quintana-Ruiz* directly considered compensation by the party who retained the expert, but the analysis applies equally to indirect funding, such as a research grant. Where a qualified scientific expert offers testimony, that testimony cannot be disregarded unless it is controverted or impeached in some material manner other than a mere fact of compensation or funding. In addition, Dr. Lewnard provided testimony explaining that his university received the grant, not himself, and that rigorous processes are in place to ensure that such funding does not affect research results. (Tr. 247:13-17, 248:10-14, 248:23-249:2, 276:8-277:11.) Nor may Dr. Lewnard's testimony be summarily disregarded simply because in the past he was a co-investigator on a study with Pfizer employees. *E.g.*, *Imperium IP Holdings (Cayman) Ltd. v. Samsung Elec. Co., Ltd.*, 757 Fed. Appx. 974, 979-80 (Fed. Cir. 2019) (affirming entry of summary judgment based on declaration of retained expert witness who previously worked with patent co-inventor).

Fourth, with respect to McClellan, she did not testify that SAR-CoV-2 was present wherever people were present. She testified that when conducting a risk analysis for the period October 2021 through early 2022, an industrial hygienist "had to assume that if people were present, COVID was present." (Tr. 299:22-300:2.) This is a material difference and makes logical sense. When a deadly virus is circulating under pandemic conditions, of course risk assessments must assume that a person may be carrying it.

Lastly, Plaintiffs argue that BART's position that "whenever one side has an expert and the other side chooses cross-examination rather than a rebuttal expert as its primary means of convincing the jury, the side with the expert must win as a matter of law." (Doc. 238 at 14.) This is another straw man argument. Cross-examination alone may be sufficient to place a scientific expert's credibility at issue such that a finder of fact can disregard their testimony. But to do so, the opposing party must introduce evidence through cross-examination that controverts or materially impeaches the expert's testimony. Here, for example, Plaintiffs could have done so by showing Dr. Lewnard public health guidance from the relevant time period stating that vaccination provided no protective effect beyond that offered by other interventions. (Plaintiffs did not do so because no such guidance existed.) That would have controverted Dr. Lewnard's

testimony and put his reliability at issue for the finder of fact. As another example, Plaintiffs could have confronted McClellan with a risk assessment she did under similar circumstances, but reached a contrary result. (Again, Plaintiffs did not do so because no such contrary assessment exists.) Indeed, Plaintiffs did not have to introduce evidence controverting the experts during cross-examination. If there were contrary public health guidance, Plaintiffs could have introduced it through other witnesses, such as Lau or Maplestone. But evidence controverting or materially impeaching an otherwise unopposed scientific expert must be introduced somehow, in some way, before a trier of fact may disregard that expert's testimony. *Quintana-Ruiz*, 303 F.3d at 77-78; *see also NewSCI, Inc. v. Staffing 340 Solutions, Inc.*, 865 F.3d 251, 257 (5th Cir. 2017) ("A jury may not disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness on a technical question beyond the competence of lay determination." (internal quotation omitted)); *Security-First Nat. Bank of Los Angeles v. Lutz*, 322 F.2d 348, 355 (9th Cir. 1963) ("the trier may not act arbitrarily in disregarding uncontradicted and entirely probable testimony of [expert] witnesses whose qualifications and judgment have not been discredited"). If there is a basis for challenging the expert's testimony, that task is not unduly burdensome. Plaintiffs' problem here was a lack of controverting or impeaching evidence, not process.

### 2. There Was No Triable Issue Concerning Whether any Plaintiff Could Work Remotely

BART's opening brief discussed undisputed evidence that each Plaintiff could not perform their essential job duties remotely. (Doc. 231 at 14-17, 25-26.) In opposition, Plaintiffs refer only to testimony from Plaintiff Ryan Rivera that "other similarly situated employees in his department were afforded the opportunity to work remotely." (Doc. 238 at 11.) Plaintiffs misstate the testimony. Rivera did not testify that other storekeepers worked remotely. Rather, he testified that some employees were transferred to a different position, material expediter, where they worked on a hybrid basis, meaning they did work <u>in person at a BART facility</u> on some days. (Tr. 648.) Rivera also admitted on cross-examination that he had no personal knowledge of any material expediter position being open at the time of his accommodation

request. (Tr. 662.)  BART also provided evidence that it considered Rivera for the open positions for which he was qualified. (Tr. 662-63, Ex. 385.)

### 3. Plaintiffs Do Not Dispute that Any Leave of Absence Would Have Been Indefinite

BART's opening brief discussed undisputed evidence that any leave of absence to permit a Plaintiff to retain their job while unvaccinated would have been indefinite, and thus was not a reasonable accommodation as a matter of law. (Doc. 231 at 17-18, 26.)  Plaintiffs' opposition does not contest this evidence or law.

### 4. Plaintiffs' Efforts to Distinguish Away BART's Authorities and Suggest that Employment Discrimination Lawsuits Invariably Present Triable Issues of Witness Credibility Are Unavailing

Unable to point to evidence that contradicts or materially impeaches BART's showing on undue burden, Plaintiffs spend six pages of their opposition trying to distinguish away BART's authorities and suggesting that employment discrimination lawsuits invariably present triable issues of witness credibility.  Neither approach has merit to defeat BART's motion.

Plaintiffs' citation of *Davis v. Team Electric Co.*, 520 F.3d 1080 (9th Cir. 2008) (Doc. 238 at 15), illustrates the inaptness of their argument.  *Davis* was a sex discrimination case where the plaintiff claimed she was subjected to sexist comments and other discrimination, resulting in a hostile work environment.  *Id.* at 1084-88.  The defendant denied that incidents of sexually charged conversations and other discriminatory conduct had occurred, so the case turned on witness credibility.  *Id.*  Here, BART's undue burden defense turns on whether permitting Plaintiffs to continue to work in person while unvaccinated would have increased the COVID-19 health and safety risk for others.  As discussed, BART introduced uncontroverted evidence that it made that assessment based on the public health guidance at the time.  Plaintiffs presented no contrary evidence to create a witness credibility issue for the jury.  *Davis* is emblematic of many employment discrimination cases, but here BART's undue burden affirmative defense rested on public health and science, rather than differing testimony about employee misconduct or harassment.

///

1         BART cites the many authorities in its opening brief because they state applicable rules of law, not because those cases concerned the same Title VII and FEHA affirmative defense at issue here. Hence, Plaintiffs' efforts to distinguish those cases based on different factual contexts are unavailing. (*See* Doc. 238 at 15-19.) What matters is how those legal rules apply to the evidence presented in this case; and BART did, in fact, cite several examples of courts entering Rule 50 orders based on uncontroverted, unimpeached witness testimony. *Chesapeake & Ohio Ry. Co.*, 283 U.S. at 216-20; *Imperium IP Holdings (Cayman) Ltd.*, 757 Fed. App. 974, 979-80 (Fed. Cir. 2019); *In re RFC and ResCap Liquidating Trust Action*, 399 F. Supp. 3d 804, 810-11, 818 (D. Minn. 2019); *Pease v. Production Workers Union of Chicago*, Case No. 02 C 6756, 2004 WL 526369, *4 (N.D. Ill. March 15, 2004); *Selle v. Gibb*, 741 F.2d 896, 903-906 (7th Cir. 1984); *Quinn v. Southwest Wood Prods., Inc.*, 597 F.2d 1018, 1024 (5th Cir. 1979).

    **C.**    **Were BART Not Entitled to Judgment as a Matter of Law, It Would Be Entitled to a New Trial Under Rule 59**

Were BART not entitled to judgment as matter of law on its undue burden affirmative defense, BART would be entitled to a new trial under Rule 59 on two separate bases.

First, the verdict on BART's affirmative defense is contrary to the clear weight of the evidence and results in a miscarriage of justice. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). As discussed in BART's opening brief and above, Plaintiffs introduced no evidence to contradict BART's showing that it relied on public health guidance to determine that vaccination was the superior intervention for preventing or decreasing the spread of SARS-CoV-2, and that other available health and safety measures would impose an increased risk for others. On this record, BART is entitled to judgment as a matter of law, but even if the Court did ascertain a triable dispute of fact, the verdict is contrary to the clear weight of the evidence and results in a miscarriage of justice.

Second, BART is entitled to retrial due to Plaintiffs' counsel's misconduct on the last day of trial, particularly the repeated violations of the Court's in limine order prohibiting references to other exemption and accommodation decisions in rebuttal closing argument. Plaintiffs' counsel express <u>no remorse</u> for their three violations of the Court's order, and instead engage in

victim blaming by suggesting that BART "forget[s] its own role in the events of which it now complains." (Doc. 238 at 21.) Plaintiffs reference testimony from Maplestone offered to establish the facts that (i) other BART employees opposed vaccination for secular reasons and (ii) BART saw instances of pre-drafted religious exemption application letters available for purchase on the internet. (*Id.*) The Court already recognized that the first point was legitimate inquiry because it provided context for why BART had to ascertain that someone seeking a religious exemption did so based on a sincerely held religious belief; were the exemption process not rigorous, it would be unfair to employees with secular objections who did not try to submit a religious exemption application. (Tr. 1104:16-1105:7.) BART made this exact argument in its closing. (*E.g.*, Tr. 1077:12-16, 1078:14-19.) The second point was also proper examination because it provided necessary context about why BART was skeptical of application letters that appeared to be form letters, rather than a direct statement of the employee's personal beliefs. As the Court ruled at trial during Plaintiffs' cross-examination of Maplestone, testimony concerning these other matters did not "open the door" to evidence or argument concerning BART's exemption and/or accommodation decisions for persons not in suit. (Tr. 1042:20-23.)

Other than victim-blaming, Plaintiffs offer no explanation or apology for their counsels' misconduct. Instead, they contend that the verdict was "modest, reasonable, and not reflective of any inflamed prejudices." (Doc. 238 at 23.) Not so. The verdict awards monetary damages to each Plaintiff of at least 175% of their claimed economic damages, with some Plaintiffs receiving substantially more, including Rivera receiving more than <u>six times</u> his highest stated economic damages.[5] Given the egregiousness of the attorney misconduct, Plaintiffs are not entitled to a free pass. Their counsel intentionally violated the most disputed in limine ruling in

---

[5] Plaintiffs' economist testified to the following maximum economic damages: $505,186 for Lewis-Williams; $657,570 for Lockett; $663,971 for Mitchell; $579,876 for Parker; $176,367 for Rivera; and $725,140 for Sun. (Tr. 971:17-24.) The verdict awarded substantially more for each Plaintiff. Lewis-Williams was awarded $1,371,367, an increase of $866,181 (271% of highest stated economic damages). Lockett was awarded $1,507,570, an increase of $850,000 (229%). Mitchell was awarded $1,163,971, an increase of $500,000 (175%). Parker was awarded $1,279,875, an increase of $699,999 (221%). Rivera was awarded $1,176,367, an increase of $1,000,000 (667%). And Sun was awarded $1,325,140, an increase of $600,000 (183%).

the case. She did so for a reason – to support their theme that BART's exemption and application process was a "sham" and inflame the jury to believe that BART acted in bad faith. Considering the nature of the misconduct, and its timing, there is more than sufficient basis to conclude that the jury was prejudicially influenced by the misconduct in reaching its verdict. Indeed, that is why counsel engaged in the misconduct. There was no reason to do so in rebuttal closing argument other than to inflame the jury. Courts may order retrial under Rule 59 based on counsel's repeated, intentional violations of in limine rulings. *E.g.*, *Anheuser-Busch, Inc. v. Nat'l Beverage Distributors*, 69 F.3d 337, 347-48 (9th Cir. 1995). Due to the cumulative impact of the violations here, and their timing in the trial, a new trial is necessary to ensure fairness.

Lastly, Plaintiffs to not dispute BART's contention that retrial should encompass both Phase I and Phase II. As discussed in BART's opening brief, because Plaintiffs seek compensation for emotional distress and related general damages, BART must be permitted to present its entire case, including how it handled and decided Plaintiffs' accommodation requests, to a jury. Otherwise, a jury would hear only part of the story, and consider damages without hearing why BART denied accommodation, to BART's prejudice. A complete trial would be a substantial imposition on a third jury and the Court, but the intentional misconduct by Plaintiffs' counsel necessitates that result if the Court does not grant BART judgment as a matter of law.

### III. Conclusion

For the reasons set forth in BART's opening brief and herein, the Court should enter judgment as a matter of law pursuant to Rule 50(b). If such a judgment is not entered, the Court should order a new trial under Rule 59.

Dated: November 19, 2024

GLYNN, FINLEY, MORTL,
HANLON & FRIEDENBERG, LLP
JAMES M. HANLON, JR.
VICTORIA R. NUETZEL
DAWSON P. HONEY

By: /s/ *James M. Hanlon, Jr.*
Attorneys for Defendant San Francisco
Bay Area Rapid Transit District